John MICHAEL, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

Supreme Court of Delaware.

Submitted: March 10, 1987.
Decided: July 10, 1987.
Reargument Denied: July 30, 1987.

Edmund D. Lyons, Wilmington, on behalf of appellant.

Richard E. Fairbanks, Jr. (argued), Chief of Appeals Div., Loren C. Meyers, and Timothy H. Barron, Deputy Attys. Gen., Wilmington, on behalf of appellee.

Before MOORE, WALSH and HOLLAND, JJ.

HOLLAND, Justice:

The appellant, John D. Michael and co-defendants, William Manchester and Steven Walls [1] were convicted of Attempted First Degree Murder, Possession of a Deadly Weapon during the Commission of a Felony and First Degree Conspiracy following a jury trial in the Superior Court in November, 1985. On April 21, 1986, both Michael and Manchester were sentenced to life imprisonment for Attempted First Degree Murder, five years of mandatory imprisonment for Possession of a Deadly Weapon during the Commission of a Felony and five years of imprisonment for First Degree Conspiracy, all sentences to run consecutively.

On appeal, Michael asserts three grounds for reversing his conviction. First, he alleges that the State failed to disclose material which would have impeached the credibility of the victim, a witness for the State. Second, he alleges that the trial court improperly limited his cross-examination of the victim. Third, he alleges that the closing argument to the jury by the prosecutor included improper references to matters that were not in evidence.

### The State's Case

On the evening of Sunday, November 4, 1984, Robert Cutrofello and Michelle Jones were bowling at an establishment located in New Castle County, Delaware. Cutrofello and Jones went into the bar that adjoined the bowling lane at approximately 10:15 p.m. Michael and Manchester were sitting in the bar when Cutrofello and Jones arrived. Cutrofello had seen the two men in the same bar one week earlier. Cutrofello and Jones left the bar at approximately 11:45 p.m.

1. Although co-defendant Walls had been convicted of the same offenses as Michael and Manchester, on the day of sentencing, April 21, 1986, the State nolle prossed the indictment underlying these convictions prior to sentencing pursuant to Superior Court Criminal Rule 48(a).

Thereafter, Walls plead guilty to First Degree Assault, Possession of a Deadly Weapon during the Commission of a Felony and Conspiracy, Second Degree and was sentenced to 15 years of imprisonment on that same date.

When Cutrofello and Jones reached their automobile, they were approached by Michael and Manchester. One of the men asked if "Cut" was his nickname. Cutrofello said yes and asked what they wanted. One man replied "somebody wants to talk to you." Jones, with apparent fear, stated she was leaving. One of the two men told her she was not going anywhere. Cutrofello told her to run. Jones ran towards the bar. As Jones approached the building, a third man, wearing a bandanna over his face, appeared and grabbed her. She was told to be quiet. Jones could hear the sounds of a scuffle behind her and could hear Cutrofello yelling "let her go."

When Jones was able to free herself or was released by the masked man, she ran back into the bar screaming for assistance. Several people in the bar responded to Jones' cry for help. The first patron out of the bar was John Kokoszka, who saw Cutrofello lying on the ground with two men leaning over him. According to Kokoszka, the men were Manchester and Michael. Kokoszka stated that he grabbed Manchester who was then holding a bloody knife in his right hand and threw him to the ground. At or about this time, another patron in the bar grabbed Michael and pulled him to the ground.[2] Kokoszka then turned to Cutrofello, whom he knew, and "asked him if these were the guys that did it." [3] According to Kokoszka, Cutrofello responded: "Let them go." Kokoszka and the other patron then released Michael and Manchester, who walked to their car in the parking lot and drove away.

Cutrofello gave the police a detailed description of each of his attackers. However, neither Cutrofello or Jones knew the names of the assailants. Jones and another patron remembered the license plate number of the car that was driven away. Police traced the license number to Mi-

chael. The car was recovered at an auto shop in Landenberg, Pennsylvania, the town where Michael was living. Two days after the attack, Jones told police that she had learned that one of the assailants was Manchester. With that information, police constructed separate photo arrays with pictures of Manchester and Michael. Jones identified Manchester and Michael from the photo arrays. Cutrofello separately viewed the same photo arrays. Although he could identify Manchester as one of his assailants, he was unable to identify Michael. Michael and Manchester were both arrested and charged with the attack on Cutrofello.

Cutrofello identified both Michael and Manchester as his assailants during the trial. Although Jones never saw Michael or Manchester stab Cutrofello, she identified them as the men in the parking lot before and after the assault. Neither Cutrofello nor Jones was ever able to identify the masked man who held Jones.[4]

### Michael's Defense

Michael testified that he left home in Landenberg, Pennsylvania on the afternoon of November 4 following a domestic dispute. He met Manchester and drove to the bar which was the scene of the assault on Cutrofello. At the bar, Michael and Manchester were drinking together until Manchester left, telling Michael that he was going to wait in the car for him.

Shortly thereafter, Michael left the bar and walked to his car where Manchester was then seated. At this time, Michael heard what he described as "a fracas going on around the corner of the building" and he walked over to investigate. Michael saw Cutrofello staggering towards him, obviously hurt. According to Michael, Cutro-

---

2. Danny Whetham, who was apparently the other patron referred to by Kokoszka, told a somewhat different story. Whetham stated that he ran up to the two men who were with Cutrofello and grabbed Manchester, who was holding a knife. Whetham testified that as he pulled Manchester from Cutrofello, Manchester leaned over and hit Cutrofello in the face. Manchester then told Whetham that he would "get" him.

3. Kokoszka never saw Michael or Manchester strike or stab Cutrofello.

4. The masked man was chased by a bar patron, and by the bar's Assistant Manager who identified Walls from a subsequent photo array as the individual whom he had chased. Walls' mask was lowered as he fled.

fello was holding an unopened knife in his hand which Michael took from him. Cutrofello grabbed Michael around the waist and both fell to the ground. Having fallen on the ground, Michael looked up and saw Manchester "real close".

At this point, people from inside the bar came running out and Michael heard somebody ask Cutrofello: "Are these the guys that did it?" Cutrofello replied: "No, let them go." Michael also heard someone else say: "They're only trying to help." According to Michael, "whoever" was holding him and Manchester then let them go. Then Michael and Manchester walked to their car and left. During the walk to the car, he threw the knife, which he had taken from Cutrofello, into an open field.

Michael stated that he did not go to the police with his knowledge of the incident because he "didn't want to get involved" and because he believed he had no information that would have been useful. The testimony of Manchester was consistent with the testimony of Michael.[5] Michael also testified that he had never been arrested for a criminal offense, and that he did not know Walls on November 4, 1984. Michael contended that Cutrofello and Jones falsely implicated him in order to protect the true perpetrators, who were members of the Pagan's Motorcycle Club (Pagans), an organization whose membership Cutrofello had recently left under circumstances which allegedly had generated some ill feelings.

## I

### The Brady Issue

The United States Supreme Court has long held that the prosecution's failure to disclose evidence favorable to an accused upon request violates due process when the evidence is material either to guilt or to punishment, irrespective of the good or bad faith of the prosecution. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The *Brady* rule was not designed to displace the adversary system as the primary means by which truth is uncovered but was designed to insure that a miscarriage of justice does not occur. The prosecutor is not required to deliver his entire file to defense counsel but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial. *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). The *Brady* rule is based on the requirement of due process. *Id.* In reviewing an alleged violation of the *Brady* rule, we must resolve two questions. First, was the non-disclosure at issue a violation of *Brady*? Second, if the non-disclosure was contrary to the dictates of *Brady*, what was the nature of the error?

The *Brady* rule arguably applies in three quite different situations. Each involves the discovery, after trial, of information which had been known to the prosecution but unknown to the defense. *United States v. Agurs*, 427 U.S. 97, 96 S.Ct 2392, 49 L.Ed.2d 342 (1976). The first situation is one in which there is no pretrial request for "*Brady* material"[6] but the evidence that is discovered after the trial demonstrates that the prosecution's case included perjured testimony and that the prosecution knew or should have known of the perjury. *Mooney v. Holohan*, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935). The second situation, illustrated by the *Brady* case itself, is characterized by nondisclosure despite a pretrial request for specific "*Brady* material." The third situation in which the *Brady* rule applies is typified by

---

5. Manchester testified that he and Michael went to investigate a "ruckus". Manchester stated that as he picked up an "open knife" which was on the ground near Cutrofello, someone attacked him from the rear. During the ensuing confusion, Manchester was knocked down several times while protesting: "I'm only trying to break this thing up." The knife which Manchester had picked up off the ground was later thrown by him into a dumpster. Manchester explained that he did not remain at the scene to speak with the police because he felt that he would be falsely implicated.

6. "Brady material" is the ordinary short-hand reference to evidence favorable to the defendant and material either to guilt or punishment. *See Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

this case and occurs when a general request for *"Brady* material" has been made.[7]

■ The evidence at issue in this case that Michael claims is *"Brady* material" is the fact that the prosecutor at Michael's trial permitted the victim of the crime (Cutrofello) before testifying to plead guilty to a charge of reckless driving, a lesser included offense of driving under the influence of alcohol, in a wholly unrelated matter.[8] This Court has recently held that the dropping of a charge against a State's witness is clearly relevant to the issue of bias. *Van Arsdall v. State,* Del.Supr., 524 A.2d 3 (1987). Evidence which the defense can use to impeach a prosecution witness by showing bias or interest, as well as exculpatory evidence, falls within the *Brady* rule.[9] *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). Such evidence is "evidence favorable to an accused" so that, if disclosed and used effectively, it might make the difference between conviction and acquittal. *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence. Indeed, it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend. *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959).

■ Whenever the State reduces any pending charges (related or not) or makes any arrangement with any State witness, disclosure is mandatory. The State was required to disclose a reduction in Cutrofello's traffic charges and failed to do so. Having concluded that there was a violation of *Brady,* we must now address its implications. Reversal of Michael's convic-

tion is required only if it is shown that there is a reasonable probability that proper disclosure would have precipitated a different result. *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481. The critical inquiry therefore becomes the *materiality* of the nondisclosed evidence.

■ When the United States Supreme Court originally found that the *Brady* disclosure requirement could apply in three different contexts, it also attempted to delineate a standard of materiality for each context. *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342. For many years, to test for a *Brady* violation, courts were first required to categorize the nondisclosed evidence and then to apply the proper test for materiality. *Stokes v. State,* Del.Supr., 402 A.2d 376 (1979). In *Bagley,* the necessity for categorization was eliminated. The Court approved a test to determine the "materiality" of the nondisclosed information sufficiently flexible to cover cases of prosecutorial failure to disclose evidence favorable to the accused in all of the *Brady* situations identified in *Agurs,* i.e., no request, a general request, or a specific request for information. Now, regardless of the nature of the *Brady* violation, the test for determining the materiality of the nondisclosed matters is the same. *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481.

*Bagley* held that in testing for all *Brady* violations, the nondisclosed evidence is *material* only if there is a reasonable probability, that had the evidence been disclosed to the defense, the result of the proceeding would have been different. *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481. The *Bagley* Court defined "reasonable probability" as a probability

---

7. Michael made a general request for *Brady* material. Manchester made a specific request for disclosure of impeachment material which included plea bargains by the State with any of its witnesses.

8. Reckless driving is an unclassified misdemeanor punishable by less than two years imprisonment, 21 *Del.C.* § 4175.

9. In 1807, the United States Supreme Court ruled that prior to trial a defendant must have access to impeachment evidence in the government's possession. That ruling was made in the context of the defendant Aaron Burr's claim that he should have access to a letter written by General Wilkinson, a key witness against Burr in his trial for treason. *United States v. Burr,* 25 Fed.Cas. 30, 36 (No. 14,692(d)) (CCVA 1807).

sufficient to undermine confidence in the outcome of the trial.

In evaluating the materiality of the non-disclosed *Brady* information, *Bagley* requires reviewing courts to directly assess any adverse effect that the prosecutor's failure to disclose might have had on the preparation or presentation of the defendant's case. The reviewing Court must also assess the effect of the nondisclosure given the totality of the circumstances. Accordingly, we are called upon to determine whether there is a reasonable probability that, had a reduction in Cutrofello's traffic charges been disclosed to Michael's attorney, the result of the trial would have been different. *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481.

The facts in this case are similar to the facts in *Bagley* and we apply the *Bagley* analysis in our review. In this case, as in *Bagley*, the Constitutional error, if any, was the State's failure to assist the defense by disclosing information that might have been helpful in conducting the cross-examination of Cutrofello. Evidence that a prosecutor dropped the charge against the witness shortly before the trial in ′order to gain more information may well have been used by defense counsel in support of an argument that that State had little confidence in its own case.[10] *Van Arsdall v. State*, Del.Supr., 524 A.2d 3 (1987). Nevertheless, non-disclosure such as this, which cannot be said to be entirely without significance, may be harmless if it occurs in a trial in which the prosecution presented "overwhelming" untainted evidence of guilt. *Id.*

*Van Arsdall* did not involve a *Brady* violation. However, it is instructive because it applied a harmless error analysis to the defendant's inability to cross-examine a key witness about bias due to a reduction in traffic charges.[11] In *Van Arsdall*, we reviewed examples of cases where errors were harmless because juries had either the benefit of direct evidence from witnesses who saw the crime take place or other unusually strong evidence. *Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); *Schneble v. Florida*, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972); *Burns v. Clusen*, 798 F.2d 931 (7th Cir.1986). In each of those cases, because the untainted evidence of guilt was overwhelming, the errors were all found to be harmless. Applying those standards to the facts in *Van Arsdall*, we concluded that in the absence of strong direct evidence of guilt, we were not convinced beyond a reasonable doubt that the error was harmless and that the evidence which was improperly excluded did not affect the jury's verdict. *Van Arsdall v. State*, 524 A.2d 3. Our review of the totality of the circumstances in this case leads us the opposite conclusion, i.e., that the State's evidence was strong and its failure to disclose the reduction in Cutrofello's driving charges was harmless error.

Michael argues that a timely disclosure of the reduction in Cutrofello's traffic charges just prior to trial would have permitted an effective cross-examination that would have demonstrated Cutrofello's bias in falsely identifying Michael at trial. However, shortly after he was attacked, Cutrofello described both of his assailants in detail to the police. He told the police that one of his assailants was wearing blue jeans and a black t-shirt with the design of an arm with a Harley Davidson tattoo and a hand squeezing Japanese figures.[12] Mi-

---

**10.** The prosecutor who reduced Cutrofello's charge of driving under the influence of alcohol was the prosecutor at Michael's trial in this case. There has been no showing that the purpose of the reduced driving plea was made in an attempt to illicit testimony favorable to the State from Mr. Cutrofello. In fact, the Deputy Attorney General who tried this case denied that allegation.

**11.** Michael argues he was denied the right to cross-examine Cutrofello's bias due to non-disclosure. Van Arsdall knew about the reduction in charges but had his right to cross-examine on that issue denied by the trial court.

**12.** The police officer who investigated this case testified that Cutrofello gave the following description of one of his assailants: The second one is a white male, twenty-eight to thirty years old, six foot to six foot one, over two hundred pounds, large build, light brown hair, cut neatly and possibly over the ears, full mustache, wearing blue jeans, open flannel shirt and black

chael testified he was wearing jeans and a black t-shirt with a Harley Davidson design on the night of Cutrofello's assault. Even though Cutrofello did not know Michael's name, he described his assailant's clothes in a manner that accurately coincided with what Michael admitted wearing. Cutrofello's description of Michael's clothing preceded the reduction of his driving charges by many months and was untainted by the subsequent plea agreement.

Our own independent direct review of the facts also shows that during the trial, *both* Cutrofellow and his companion, Jones, identified Michael and Manchester as Cutrofello's assailants. In addition, Whetham, testified that as he pulled Manchester away from Cutrofello, Manchester leaned over and hit Cutrofello in the face. Efforts by defense counsel to discredit the testimony of Jones and Whetham before the jury were apparently unsuccessful.[13] Both Michael and Manchester testified in their own defense. They admitted being present at the scene of Cutrofello's assault but gave their own explanations for holding bloody knives over the victim. The jurors were called upon to assess not only the credibility of Cutrofello but also the credibility of Jones, Whetham, Kokoszka, Manchester and Michael. The jurors resolved the issue of credibility against Michael. The members of the jury are the sole judges of the credibility of all witnesses. *Tyre v. State,* Del.Supr., 412 A.2d 326, 330 (1980).

In this case, we are assisted in our review by having the benefit of the trial court's analysis of Michael's present claim. In denying Michael's motion for a new trial because of the State's failure to disclose the reduction in Cutrofello's driving charges, the trial judge ruled:

> Even if one may consider a reduction of a pending charge against the victim as *Brady* material prior to trial, the Court is of the opinion that failure to disclose this matter, if any error at all, is harmless error.

T-shirt with a design of an arm with a Harley Davidson tattoo and a hand squeezing Japanese figures.

Defendants were charged with Attempted Murder First Degree. The victim was charged with Driving Under the Influence. The victim's charge was reduced to Reckless Driving and the victim pled guilty. As to whether or not the victim received any benefit for testifying is *de minimis.*

The victim was seriously stabbed as evidenced by the hospital records, his testimony, and the testimony of eye witnesses.

The defendant's identification was made not only by the victim but by patrons of the bar and by the barmaids. Any benefit to be derived from cross-examination of the victim as to reduction of the charge of Driving Under the Influence to reckless Driving is *de minimis.*

We would recognize that the jury's estimate of the truthfulness and reliability of a given witness, especially the victim, may well be determinative of guilt or innocence. Cf. *Mapue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). However, under the circumstances of this case, we agree with the trial court. The State's failure to disclose a reduction in Cutrofello's traffic charges, albeit error, was harmless. Our review of the record leads us to conclude that there is no reasonable probability that, had the reduction in Cutrofello's traffic charges been disclosed to the defense, the result of the trial would have been different. The State's case was strong. In fact, the undisputed testimony in the record supports Michael's conviction, completely independent of any testimony from Cutrofello.

## II

### *Cross-Examination of Victim*

■ Michael's second argument also relates to an alleged inability to develop a separate issue of bias on the part of the victim, Cutrofello. Specifically, Michael ar-

13. The defense challenged Jones' mysterious telephone call to the police naming Manchester as one assailant. The defense also challenged the accuracy of Whetham's testimony alleging that he was intoxicated.

gues that the trial court improperly limited the cross-examination of Cutrofello concerning those persons with whom Cutrofello had discussed the case prior to testifying. The following exchange took place during the cross-examination of Cutrofello by Michael's attorney:

Q. Have you spoken to any of them [members of the Pagan Motorcycle Club] concerning this case?

A. Yes, I have.

Q. Who have you spoken to concerning this case?

A. I can't tell you that.

Q. Why can't you tell me that?

A. Because I don't want to involve them.

MR. AGOSTINI: Your Honor, I would ask that the witness be instructed to answer the question.

THE COURT: Does the State have any position?

MR. BARRON: May we approach the bench?

THE COURT: You may.

At sidebar, the State noted that in an office conference prior to trial, all parties, including Michael, had agreed to avoid reference to the Pagans. At sidebar, counsel for *both* of Michael's co-defendants objected to the proposed area of inquiry as prejudicial. The trial judge instructed Michael's attorney that "if you can give me some relevancy, some reason to require him to give you those names, I will." Michael's attorney responded that he wanted to find out whether or not Cutrofello was "covering up" for someone else who was a member of the Pagans and the actual assailant. The Court ruled "during the course of the trial, if you can show he's covering up, fine, but with the record we have so far, there is no reason for me to require him to give those names to you."

Michael's attorney then continued his cross-examination of Cutrofello with the following question and answer:

Q. Mr. Cutrofello, I'm not going to ask you to reveal the names of any Pagan members. I'm just going to ask you whether any of the information you mentioned earlier about things you heard subsequent to the assault, subsequent to your identification with Detective Flynn on November 14, 1984, did that information make you believe that Mr. Micahel (sic) was one of the attackers? Did that sort of add to your belief? Did any of that information come from members of your former gang—I'm sorry—former club in which you were a member of?

A. No.

The cross-examination of Cutrofello by Michael's attorney, continued until its conclusion without objection or interruption. There was no further request by Michael's attorney for the undisclosed names of the Pagans that had been the subject of the sidebar.

In this case, the theory of trial counsel for Michael was that Cutrofello was withholding the true identity of those responsible for the attack and was making Michael a "scapegoat." According to Michael's theory, Cutrofello was really assaulted by members of the Pagan Motorcycle Club due to the circumstances relating to his departure from that group. Michael argues that with the names of the Pagans who spoke to Cutrofello before trial, that proposition could have been developed. Michael alleges that it would also explain why at the time of the assault Cutrofello had stated to let Michael and Manchester go.

It is well settled that the bias of a witness is subject to exploration at trial and is always relevant as discrediting the witness and affecting the weight of his testimony. *Weber v. State*, Del.Supr., 457 A.2d 674, 680 (1983) citing *Davis v. Alaska*, 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974). In fact, the United States and Delaware confrontation clauses create a presumption in favor of cross-examination, especially in matters relevant to credibili-

---

**14.** Both the United States and Delaware Constitutions guarantee the right of a defendant to confront the witnesses against him. (U.S. Const. Amend. VI and Del. Const. Art. I, § 7.) Michael correctly asserts that a defendant's right to confrontation, as secured by the federal

ty.[14] *Weber v. State*, 457 A.2d at 682. In *Weber*, we held that the logical extension of these principles "requires that counsel be permitted to inquire into any acts, relationships, or motives reasonably likely to create bias." *Weber v. State*, 457 A.2d at 680. In this case, the victim admitted that prior to trial, he had spoken to certain members of the Pagan Motorcycle Club about the case. If the right to inquire "into any acts, relationships, or motives reasonably likely to create bias" is to have any meaning it must logically include a right to know the names of those persons with whom the witness conversed prior to testifying.[15] Defense counsel was entitled to know the names of anyone with whom Cutrofello discussed his testimony prior to trial. Those names would open countless avenues of in-court examination and out-of-court investigation "into acts, relationship or motives reasonably likely to create bias." *Id.* Cf. *Smith v. Illinois*, 390 U.S. 129, 131, 88 S.Ct. 748, 749–750, 19 L.Ed.2d 956 (1968). The words of the United States Supreme Court in reversing a federal conviction are applicable here:

> It is the essence of a fair trial that reasonable latitude be given the cross-examiner, even though he is unable to state to the court what facts a reasonable cross-examination might develop.... There is a duty to protect him from questions which go beyond the bounds of proper cross-examination merely to harass, annoy or humiliate him ... But, no such case is presented here.

and Delaware Constitutions, is effectuated primarily by the right of cross-examination. *Davis v. Alaska*, 415 U.S. 308, 315–316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974); *Weber v. State*, Del.Supr., 457 A.2d 674 (1983).

15. This case involved the testimony of a lay witness. We conclude that disclosure of prior contacts is mandated by the right to pursue bias through cross-examination. We have previously held that establishing the facts and data upon which an expert opinion is based is a prerequisite to the opinion's admissibility and inexorably tied to the defendant's right of cross-examination. *Fensterer v. State*, Del.Supr., 509 A.2d 1106 (1986).

16. The trial court is not required to allow cross-examination on topics of marginal or minimal

*Alford v. United States*, 282 U.S. 687, 692–94 [51 S.Ct. 218, 219–220, 75 L.Ed. 624] (1931).[16]

The prosecutor argued that Cutrofello's disclosure of the Pagan names would place his life in danger. If a person has a duty to disclose the name of anyone he spoke to about the case before testifying *a fortiori*, he has a duty to disclose the names of persons who may have threatened his life.[17] If the concern over disclosure resulted from the fact that the undisclosed persons were or knew the actual assailants, the disclosure was central to Michael's defense.

 Having determined that Cutrofello should have been required to disclose the names of the persons that he spoke to prior to trial about the case, we must now examine the nature of that error. In *Weber* we held:

> When the cross-examination relates to impeachment evidence, the test for determining if the trial judge's limitation on cross-examination violated the defendant's confrontation right is whether the jury had in its possession sufficient information to appraise the biases and motivations of the witness. *Chipman* [*v. Mercer*], 628 F.2d at [528] 530 [9th Cir.1980]. More specifically, we look to the cross-examination permitted to ascertain (1) if the jury was exposed to facts sufficient for it to draw inferences as to the reliability of the witness and (2) if defense counsel had an adequate record from which to argue why the witness might have been biased. [*United States v.*]

relevance merely because bias or prejudice may be disclosed. *Weber v. State*, 457 A.2d at 682.

17. The lower federal courts have offered varying interpretations of *Alford* and *Smith* and have carved out an exception against answering certain questions when a witness's safety is at risk. *See United States v. Baker*, 419 F.2d 83 (2nd Cir.1969); *United States v. Persico*, 425 F.2d 1375 (2nd Cir.1970); *United States v. Alston*, 460 F.2d 48 (5th Cir.1972); and *Egger v. United States*, 509 F.2d 745 (9th Cir.1975). Those cases are distinguishable on their facts from this case. The State and the trial court can also take various precautions to provide for the safety of a witness.

*Summers,* 598 F.2d [450] at 461 [5th Cir.1979].

457 A.2d at 682.

This holding in *Weber* has been reaffirmed in subsequent decisions by this Court and the United States Supreme Court. *Delaware v. Van Arsdall,* 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) and *Van Arsdall v. State,* Del.Supr., 524 A.2d 3 (1987).

In this case, although Cutrofello did not disclose the names of the persons that he spoke with prior to trial, he did disclose the substance of the conversations. He also stated that those conversations did not influence his testimony. Moreover, during closing argument, Michael's trial counsel *repeatedly* challenged Cutrofello's credibility based upon his refusal to identify the persons he spoke with before trial.[18] Michael's attorney argued that Michael and Manchester were "good samaritans" who had been made scapegoats by Cutrofello out of fear that he would be attacked again if the identities of any Pagans were revealed. Michael's attorney argued as forcefully to the jury as if the names had been disclosed and those disclosures had led to the identification of Pagans as Cutrofello's assailants.

In this case, the cross-examination which was permitted exposed the jury to sufficient facts for it to draw inferences as to the reliability of Cutrofello. He admitted having a conversation with Pagans prior to trial. He refused to identify those individuals. He stated that they did not influence him. The record also reflects that Michael's defense counsel had an adequate basis from which to argue why Cutrofello might have been biased and used Cutrofello's refusal to disclose the identity of the Pagans as a major part of his efforts in closing arguments to discredit Cutrofello's testimony.

We are satisfied that the jury had sufficient information to appraise the possible bias of Cutrofello. Cf. *Weber v. State,* Del.Supr., 457 A.2d 674. We are convinced beyond a reasonable doubt that the State and federal confrontational clause error of the trial court, in limiting cross-examination as to the actual identities of the Pagans with whom Cutrofello discussed the case, was harmless and did not affect the jury's verdict.

### III

### *Challenge to Prosecutor's Closing Argument*

■ Michael's final argument is that improper final argument by the prosecutor

---

18. The following portion of the closing argument to the jury by Michael's trial attorney is illustrative:

The only person who really knows whether it was a Pagan pay back or not is the first witness you saw on the stand here on Tuesday, Robert Cutrofello. He would know, but he wouldn't say, although it seems clear that there was some type of Pagan involvement. He was especially careful in trying to avoid any type of statement that would indicate that that were the case. And in his statement to Detective Flynn, which you heard Detective Flynn talk about, he stated that, no, he—although ejected from the Pagans, he had a very good relationship with them and he didn't know of anyone who would hurt him. That's inconsistent with what you know. And I think if we're going to evaluate the evidence, you have to look at the demeanor of the witnesses while they're on the stand. Robert Cutrofello's demeanor, I believe, was arrogant. I believe he refused to answer questions. I believe he was hiding something.

This is very unusual in a criminal case to have a victim of a crime and—and most assuredly he's a victim. Whoever did this to Robert Cu-

trofello should be punished, but it's very unusual to have a—the victim of a crime so uncooperative, so concealing in his testimony. Why was he so afraid to disclose information on the people he talked to about this incident, just as his girlfriend was afraid to disclose the information that she had and the people she talked to about the incident? It's inconsistent with the prosecution's idea that these people here were Pagan hit men because if they were, then they wouldn't be afraid to talk about that information.

I propose that John Michael is merely a scapegoat. Robert Cutrofello is holding something back. I believe that is who really committed these crimes or maybe information that would lead the police to find out who really committe these crimes. And the reason he keeps that information a secret is because of his fear for reprisal. Now, that's consistent because if it was a Pagan pay back, then his demeanor on the stand makes sense. He's playing along, hanging the rap on the two individuals who were there trying to help him in order to protect people he knows will do it again and he knows better than to talk.

regarding matters not in evidence requires reversal of his conviction.[19] The specific remarks made by the prosecutor in his *opening* statement which Michael alleges were unsupported by the evidence are:

1. Steven Walls *as a Pagan* was "out to get" Cutrofello because Cutrofello was rumored to be a police informant.

2. The attack on Cutrofello by Michael and Manchester involved "the administration of justice Pagan style",

3. Cutrofello did not immediately implicate Michael and Manchester because of *"the Pagan creed to never get the police involved"* and,

4. Michael and Manchester earned *"increased esteem" with the Pagans* by virtue of their attack on Cutrofello.

We have reviewed the opening statement by the prosecutor and the record in this case. We conclude that Michael has failed to meet his burden of demonstrating that the prosecutor's remarks were improper. In his final summation, the prosecutor is not confined to a repetition of the evidence presented at trial. "He is allowed and expected to explain all legitimate inferences of the [defendant's] guilt that flow from the evidence." *Hooks v. State*, Del.Supr., 416 A.2d 189, 204 (1980). We find that the remarks which Michael now challenges were not improper but that, when read in context, were all legitimate inferences that could logically be drawn from the evidence presented at trial. *Id.*

Michael's last challenge to the prosecutor's closing argument is directed at comments which were made during *rebuttal*. Those comments by the prosecutor were:

Ladies and Gentlemen, Mr. Cutrofello likes living just as we all do. He's come too close to death to risk it a second time. Anyone familiar with the Pagans organization knows that Pagans have associates and that the associates, a lot of times, do the dirty work for the Pagans.

Michael argues that the foregoing theories or opinions of the prosecutor regarding the Pagan organization, the method by which it

operated and the assertion that Cutrofello would have been threatened with death if he testified concerning the Pagans are unsupported in the record.

■ On appeal, the State acknowledges that these comments by the prosecutor exceeded the scope of the evidence. However, Michael did not object to these remarks at trial. This Court has repeatedly emphasized the necessity of making timely objections to closing remarks by opposing counsel which are arguably improper. *Hooks v. State*, Del.Supr., 416 A.2d 189. The failure to make a contemporaneous objection to a closing argument generally constitutes a waiver of the right to raise the alleged errors on appeal. *Goddard v. State*, Del.Supr., 382 A.2d 238 (1977). Since there was no objection at trial, but the remarks were improper, our standard of review with respect to these challenges by Michael is whether the prosecutor's statements amounted to plain or fundamental error so as to "clearly deprive [defendant] of a substantial right, or which clearly show manifest injustice." *Ward v. State*, Del.Supr., 366 A.2d 1194, 1197 (1976); *Brokenbrough v. State*, Del.Supr., 522 A.2d 851, 856 (1987). In our review we are guided by the United States Supreme Court:

Inappropriate prosecutorial comments, standing alone, would not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding. [470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1] Instead, as *Lawn [v. United States*, 355 U.S. 339, 78 S.Ct. 311, 2 L.Ed.2d 321] teaches, the remarks must be examined within the context of the trial to determine whether the prosecutor's behavior amounted to prejudicial error. In other words, the Court must consider the probable effect the prosecutor's response would have on the jury's ability to judge the evidence fairly. In this context, defense counsel's conduct, as well as the nature of the prosecutor's response, is relevant. See *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 242, 60 S.Ct. 811, 853, 84 L.Ed. 1129

---

**19.** Michael did not object to any of these re-marks at trial and neither did his co-defendants.

(1940); *Crumpton v. United States*, 138 U.S. 361, 364, 11 S.Ct. 355, 356, 34 L.Ed. 958 (1891). Indeed most Courts of Appeals, applying these holdings, have refused to reverse convictions where prosecutors have responded reasonably in closing argument to defense counsel's attacks, thus rendering it unlikely that the jury was led astray.

*United States v. Young*, 470 U.S. 1, 105 S.Ct. 1038, 1045, 84 L.Ed.2d 1 (1985).

Therefore, in determining any prejudicial effect caused by the prosecutor's rebuttal, we must also consider the closing argument made by Michael's attorney. The nature of our legal system generally precludes a review of defense counsel's argument to the jury because if the defendant is acquitted, there is no appellate review and if there is a conviction, it is the prosecutor's closing that is subjected to the strictest scrutiny. *Brokenbrough v. State*, Del. Supr., 522 A.2d 851. However, the United States Supreme Court, this Court and the ABA Standards make it clear that "counsel on that both sides of the table share a duty to confine arguments to the jury within proper bounds." *United States v. Young*, 105 S.Ct. at 1043 (1985). The ABA Standards for Criminal Justice properly hold all advocates to essentially the same standards. ABA Standards for Criminal Justice 4–7.8 (2d ed. 1980). The commentary notes both the prosecutor and defense counsel are subject to the same general limitations in closing argument. *Id. United States v. Young*, 105 S.Ct. at 1043 (1985).[20] "Just as the conduct of the prose-

cutors is circumscribed, the interests of society in the preservation of courtroom control by the judges are no more to be frustrated through unchecked improprieties by defenders." *Id.* The prosecutor's duty to seek convictions is tempered by his obligation to do justice.[21] The defense attorney's obligation to represent his client zealously must be accomplished "within the bounds of the law."

We have recently held that the ABA Standards for Criminal Justice, the Prosecution and Defense Functions have equal application to prosecutors and to defense counsel. *Grayson v. State*, Del.Supr., 524 A.2d 1, 3 (1987). Defense counsel, like the prosecutor, must refrain from interjecting personal beliefs and facts outside of the record into the argument to the jury. *Id. Brokenbrough v. State*, 522 A.2d 851 (1987). See e.g. ABA Code of Professional Responsibility, DR 7–106(c)(3) and (4); ABA Model Rules of Professional Conduct Rule 3.4(e) (1983). Compare, *Coe v. Schneider*, Del.Supr., 424 A.2d 1 (1980).

We have set out part of the closing argument by Michael's trial attorney in footnote 18 at length. Portions of the closing argument by Michael's attorney were improper. Not only did Michael's attorney refer to facts that were not in the record but he improperly interjected his personal opinions into the case. The prosecutor's remarks in rebuttal were a direct response to Michael's argument:

I hope the prosecution isn't making the argument that, well, the Pagans decided

---

**20.** ABA Standards for Criminal Justice 4–7.8, provides:

(a) In closing argument to the jury the lawyer may argue all reasonable inferences from the evidence in the record. It is unprofessional conduct for a lawyer intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.

(b) It is unprofessional conduct for a lawyer to express a personal belief or opinion in his client's innocence or personal belief or opinion in the truth or falsity of any testimony or evidence, or to attribute the crime to another person unless such an inference is warranted by the evidence.

(c) A lawyer should not make arguments calculated to inflame the passions or prejudices of the jury.

(d) A lawyer should refrain from argument which would divert the jury from its duty to decide the case on the evidence by injecting issues broader than the guilt or innocence of the accused under the controlling law or by making predictions of the consequences of the jury's verdict.

(e) It is the responsibility of the court to ensure that final argument to the jury is kept within proper, accepted bounds.

ABA Standards for Criminal Justice 4–7.8 (2d ed. 1980).

**21.** The "Special Responsibilities of a Prosecutor" are set forth in Rule 3.8 of the Delaware Rules of Professional Conduct.

that Robert Cutrufello had to go, so they went out and hired two totally unrelated individuals to go out and do the hit. Anyone who has familiarity with how the Pagan Motorcycle Club operate in [sic] the secrecy involved in the organization would know that that would never happen.

The improper arguments by Michael's attorney should have been objected to promptly by the prosecutor. Cf. *Grayson v. State*, 524 A.2d 1. Instead, the prosecutor replied to those remarks in rebuttal.

■ The situation before us is very similar to the one before the United States Supreme Court in *Young*. The defense counsel argued improperly, provoking the prosecutor to respond in kind, and there was no corrective action. Although two improper arguments do not make for a right result, a criminal trial is not to be lightly overturned. *United States v. Young*, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1. In assessing these types of problems, Courts have invoked the "invited response" or "invited reply" rule enunciated in *Lawn v. United States*, 355 U.S. 339, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958). We reiterate this Court's position that improper closing remarks should be met with an objection, not a similarly improper response. *United States v. Young*, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1; *Grayson v. State*, Del.Supr., 524 A.2d 1; *Brokenbrough v. State*, 522 A.2d 851.

■ The key issue before us is, therefore, not whether the prosecutor's remarks were erroneous, but given the fact that they were improper did they rise to the level of "plain error." We have previously adopted a three-prong test for determining whether improper prosecutorial remarks require the reversal of a conviction because they have affected substantial rights of the accused. *Hughes v. State*, Del.Supr., 437 A.2d 559, 571 (1981). The three-prong test requires us to examine (1) the centrality of the issue affected by the alleged error; (2) the closeness of the case and (3) the steps

taken to mitigate the effects of the alleged error.

■ Although Cutrofello's credibility was a central issue in this case, as we have already concluded, the balance of the State's case against Michael was strong. Michael's conviction was supported by so much independent evidence that Cutrofello's testimony was almost cumulative. In this case, the prosecutor's argument about Cutrofello's fear for his life was harmless since it was consistent with Michael's argument that the very existence of Cutrofello's fear was a basis upon which to acquit Michael because the real perpetrators of the crime were the Pagans that Cutrofello refused to identify. In effect, the prosecutor's remarks supported the theory of Michael's defense, i.e. that Michael was not a Pagan, that the Pagans were the cause of Cutrofello's attack and, that his continued fear of the Pagans caused him to refuse to identify them at trial. The prosecutor's comment in rebuttal was erroneous because it was not supported by the record but, when viewed in the context of this case, was not such as to undermine the fundamental fairness of the trial, did not contribute to a miscarriage of justice and was not plain error. *United States v. Young*, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1; *Brokenbrough v. State*, Del. Supr., 522 A.2d 851.

### Cumulative Effect of Error

■ Our review of this record has lead us to conclude that there were three separate instances of error at Michael's trial and in each instance, we have determined that the error was harmless. However, where there are several errors in a trial, a reviewing court must also weigh the cumulative impact to determine whether there was plain error from an overall perspective. *Wright v. State*, Del.Supr., 405 A.2d 685, 690 (1979). This trial was complicated by multiple defendants with inconsistent positions.[22] Even Michael and Manchester,

---

**22.** In his opening statement, the prosecutor told the jury that the State did not know the motive for the attack on Cutrofello. Michael's attorney

attempted to develop a Pagan motive for the attack as Michael's defense. The State responded to that defense by arguing that even a Pagan

who were friends and not Pagans, did not use identical tactics at trial. The experienced trial judge did an exceptional job in keeping the focus of the jury on the varying defenses that were presented. We are of the opinion that the total effect of these harmless errors was not greater than the sum of each part. When the errors are added together, in the context of this case, they remain harmless. The convictions of Michael are AFFIRMED.

### On Motion for Reargument

This 30th day of July, 1987, the Court has before it Michael's Motion For Reargument, submitted to us on July 22, 1987. Michael first argues that it is unfair to require him to "show" that Cutrofello's plea bargain was related to his trial testimony. In its opinion of July 10, 1987, this Court held that "whenever the State reduces any pending charges (related or not) or makes any arrangement with any State witness, the disclosure is mandatory." Michael was not required to show that the reduction in charges was in exchange for Cutrofello's testimony. Footnote number 10, which is cited by Michael in his Motion For Reargument, is an observation by the Court that although, in fairness to Michael, there was an assumption that the plea bargain was in return for Cutrofello's testimony, this assumption was not necessarily supported by the evidence.

Michael's second argument in requesting reconsideration is a renewal of his contention that the State's case was not strong and that there was not independent evidence (independent of Cutrofello) to support Michael's conviction. This argument by Michael was carefully considered by the Court in its opinion and rejected. We have reconsidered Michael's argument and reach the same conclusion.

Michael's final argument in support of his application for reconsideration is that certain inferences made by the prosecutor in his closing statement to the jury were

---

motive would link Michael and Manchester to the Pagans via Walls, a Pagan. Manchester argued that the Pagan motive was not logical. Walls objected to any Pagan reference and did not remark on the Pagans in closing.

not supported by the record. An inference, by its very nature, is a proposition that is not proven directly but does follow logically from other facts which are in evidence. The record in this case was carefully reviewed by the Court. The Court continues to conclude that the statements made by the prosecutor in his opening statement to the jury were logical inferences that could be drawn from facts that were in evidence. The statements made by the prosecutor in rebuttal, as the State admits, are not logical inferences from the evidence.

NOW, THEREFORE, it is hereby ordered that the Motion For Reargument is DENIED.