**Melvin E. BOARDLEY, Defendant
Below, Appellant,**

v.

**STATE of Delaware, Plaintiff
Below, Appellee.**

Supreme Court of Delaware.

Submitted: March 26, 1992.
Decided: July 24, 1992.
Rehearing Denied Aug. 17, 1992.

Bernard J. O'Donnell and Brian J. Bartley (argued), Asst. Public Defenders, Office of Public Defender, Wilmington, for appellant.

Gary A. Myers (argued), Deputy Atty. Gen., Dept. of Justice, Georgetown, for appellee.

Before HORSEY, WALSH and HOLLAND, JJ.

WALSH, Justice:

This is an appeal from a conviction of murder first degree and a related weapons offense following a jury trial in the Superior Court. The appellant, Melvin Boardley, was sentenced to life imprisonment without the possibility of parole for the murder conviction and an additional sentence of five years for the weapons offense. On appeal, he asserts two claims of error: the failure of the trial court to suppress the seizure of his hat during a warrantless search and the refusal of the trial court to order the non-consensual securing of a blood sample from a third party for use as potentially exculpatory evidence. We find no error in the rulings of the Superior Court and accordingly affirm the convictions.

## I

The evidence presented by the State fairly depicted the following events. On January 28, 1990, at approximately 3 a.m., James F. Thomas was attempting to make a call from a public phone outside a club in Wilmington. Thomas had a brief confrontation with a passerby with whom he exchanged words. The passerby went to the middle of the street to speak to a man, later identified as Therome Clark, who was alighting from a car. After securing a cigarette from Clark, the individual returned to Thomas to continue the argument. After a brief exchange, the individual drew an automatic pistol and, despite Thomas' retreat, shot Thomas in the chest, killing him. The assailant then fled the scene.

During the confrontation Thomas' brother-in-law, Nathan Williams, was standing nearby. He overheard the words exchanged and saw the shot fired. Williams gave the police a description of the assailant—a black man, wearing dark clothing including a brown or black brim hat—who had fled the scene. Later Williams identified the assailant, the defendant Boardley, from a photo lineup and claimed to have known Boardley at school. Williams also identified Clark, who had also left the scene, as the person Boardley spoke to in the middle of the street.

Shortly after the shooting, Boardley appeared at the apartment of his girlfriend, Patricia Walston. Walston was not there but her sister, Brenda Irby, was present. Irby testified that Boardley asked for her help because he had just shot a man in the arm after an argument. Boardley stayed that night at the apartment where he was arrested by police the next morning. At the time of his arrest, Boardley was not wearing the clothing described by Williams but as they were leaving the apartment, someone, apparently a police officer, placed a brim hat on Boardley's head. Later while Boardley was in custody the hat was noted to fit the description of the hat worn by Thomas' assailant. The hat was seized and, over defense objection, admitted in evidence, along with a black leather jacket after identification by Williams[1] as matching the clothing worn by Thomas' assailant.

---

1. Before Boardley's arrest, the police secured a search warrant for the home of Boardley's mother for a gun and his clothing, including the hat and a black jacket. Although these items

Clark, who was identified by Williams as having talked to Boardley shortly before the shooting, later became the subject of investigation by police. Clark, who lived a short distance from the crime scene, returned to that location about an hour after the shooting and dropped a note in view of police officers. The note offered "a favor for a favor." At the time of the killing, Clark was facing prosecution on robbery charges. Upon being confronted about the note, Clark told police that he heard the shot and saw a black male running from the scene. He denied being with the assailant prior to the shooting and gave several inconsistent versions of his role in the incident. Clark later became uncooperative to the point where he refused to testify at Boardley's trial unless granted immunity. Clark also refused to provide a blood sample, at Boardley's request, in order to determine whether blood found on Clark's hand matched that of the victim. At trial, Clark ultimately testified for the State and identified Boardley as the individual who argued with Williams and then shot him.

Although he did not testify, Boardley's girlfriend claimed that he was with her at her apartment until 2 a.m. and when she left he was asleep. She testified that when she last saw Boardley he was wearing a black and red sweater and lime green pants. Boardley argued to the jury that Clark's suspicious conduct and evasiveness suggested that he was actually the gunman. The jury apparently rejected this contention and convicted Boardley of first degree murder and the accompanying weapons offense.

## II

■　Boardley's first contention of error is the refusal of the Trial Judge to suppress the seizure of his hat by police shortly after his arrest. He argues that the seizure of the brim hat was in violation of the constitutional standards as well as contrary to the search warrant statute. 11 *Del.C.* § 2301.

Within hours of Thomas' death the police secured an arrest warrant for Boardley charging him with first degree murder. They also secured a search warrant from a Municipal Court judge authorizing the search of the home of Boardley's mother at 911 Pine Street, where Boardley was thought to be living. The search warrant authorized seizure, as evidence of a crime, of a semi-automatic handgun and "a black hat, a black jacket, black pants, black shoes and a green sweater or sweatshirt." Boardley was not present at the Pine Street address and no items of his clothing were seized. When the police then went to the home of Boardley's girlfriend, they located Boardley but found no gun. Since it was a wintry day, the arresting officers requested a woman in the house to secure a jacket for Boardley, who was handcuffed. As they left the apartment, the police placed a brim hat on Boardley's head. Upon arrival at the police station these items, along with Boardley's other personal belongings, were inventoried and secured in police custody. Later when the police learned from Brenda Irby that Boardley was wearing a brim hat shortly after the shooting, the hat, already in police custody, was formally seized for use as evidence.

Boardley's argument that the police had no authority to seize the hat at the time of his arrest lacks a factual premise. There was no seizure of the hat at the time Boardley was arrested because the police were not interfering in any meaningful way with Boardley's possessory interests in the hat. *See United States v. Jacobsen,* 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984). The trial court found that, at the time of the arrest, the police were not aware of the significance of the hat as evidence. Thus, in placing the hat on Boardley's head incident to transporting him, the police could hardly be said to have engaged in a seizure. Indeed, by placing the hat on his head and permitting him to retain it until it was inventoried incident to the booking process, the police were recog-

were not located at the home of Boardley's mother, a black leather jacket was later produced by Boardley's girlfriend. On appeal, Board-

ley does not allege error in admission of the leather jacket.

nizing Boardley's continued right to possession of the hat. As the Trial Judge noted in denying the motion to suppress, the initial police contact with the hat was "innocuous" and the evidentiary value of the evidence was not recognized until later when the item was in police custody for an entirely different reason.

The Trial Judge determined that the police did not resort to subterfuge or trickery in securing Boardley's hat so that he could wear it to the police station. As a factual finding that conclusion is binding on this Court if supported by sufficient evidence and the product of a logical and orderly deductive process. *Downs v. State*, Del. Supr., 570 A.2d 1142, 1144 (1990). On the present record, we perceive no basis to disturb it.

Boardley's argument that the "discovery" of the hat resulted from a generalized search of the bedroom where he was arrested is equally without merit. Since the police were in possession of a warrant for Boardley's arrest they were authorized to seize his person and transport him, suitably attired, to the police station. Whether or not a general unauthorized search of the premises occurred is irrelevant unless there is a nexus between that search and the placing of the hat on Boardley's head incident to his transportation. Since the trial court specifically determined that the hat was not related to any prior search, it is unnecessary to examine the scope and authority of such a search.

█ Once the brim hat came into police custody for safekeeping purposes, it was subject to seizure under the plain view doctrine when its evidentiary value became known. *Wicks v. State*, Del.Supr., 552 A.2d 462, 465 (1988) (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 466, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971)). Seizure of evidence under the plain view doctrine is permitted where (1) the view of the evidence results from a lawful police activity such as execution of a search or arrest warrant, (2) police contact with the evidence is inadvertent, and (3) the item, when seized, is of "immediately apparent evidentiary value." *Id.* Since the trial

court has determined, as a factual matter, that the initial contact with the hat was not contrived, resulted from the execution of a valid arrest warrant and that the evidentiary value of the item did not become apparent until other information was conveyed to the police, the *Wicks* standard is clearly satisfied. Accordingly, we affirm the ruling of the Superior Court declining to suppress the seizure of the brim hat.

### III

█ We next address an issue which arose from a pretrial ruling of the Superior Court. Boardley claims that he was denied access to important exculpatory evidence when the Superior Court refused to require Clark to provide a blood sample.

At the time the police first spoke to Clark, following his dropping of the note, they noticed blood on the fingernail of his right hand. Because of Clark's unusual actions following the shooting and his contact with the assailant prior to the shooting, the police secured scrapings and clippings of the fingernail. These items were submitted to the Federal Bureau of Investigation ("FBI") for serological analysis and comparison with the victim's blood. In response the FBI reported on May 31, 1990 that the scrapings were insufficient for comparison and that a sample of Clark's blood as well as additional samples of the victim's blood would be required for a definitive analysis. Boardley promptly filed a motion to compel Clark to provide a blood sample and the State did not oppose the request.

Clark, represented by counsel, refused to provide the sample and moved to dismiss Boardley's application. The Superior Court ruled that Boardley lacked standing to compel Clark to provide a blood sample and the court did not have "the prosecutorial authority" to require a witness to submit to a blood test. The State thereupon filed a motion to compel which essentially adopted Boardley's factual basis as "probable cause to withdraw Therome Clark's blood." Clark again objected through counsel that the State had not demonstrated probable cause to invade the privacy of a witness.

The Superior Court ruled that it would not consider the State's application unless it was in the form of a request for a search warrant. In compliance with the court's suggestion, the State sought the issuance of a search warrant accompanied by an "Additional Probable Cause Sheet," attested to under oath by a Deputy Attorney General, which contained, *inter alia*, the following information:

> The Defendant's Opening Memorandum on his Motion to Compel sets forth a factual predicate for probable cause. Specifically, pages seven and eight of the Defendant's Memorandum indicate that another State witness, Nathaniel Williams, observed Therome Clark hand the defendant what appeared to be a pack of cigarettes, immediately prior to the shooting. Therome Clark may also have fled in the defendant's direction, when Nathaniel Williams used the phone to call police. The defendant then notes in this Memorandum that Therome Clark denies having handed the defendant anything. This denial, the defense argues, coupled with the blood on Therome's finger and the fact that no murder weapon was located, provides a basis for probable cause to withdraw Therome Clark's blood. Your affiants pray that a Search Warrant be granted for the withdrawal of blood samples from Therome Clark to compare with the victims blood and the blood found on Therome Clark's right index finger.

The Superior Court conducted a further hearing on the State's application for a search warrant. When the prosecutor was unable to state that there was probable cause to believe that Clark had committed any crime, the court refused to authorize the issuance of a search warrant for the taking of a sample of his blood.

When Clark was called by the State as a witness at trial, he invoked his right against self-incrimination. Upon the grant of immunity Clark testified against Boardley and identified him as the individual who confronted the victim. In cross-examination, Clark admitted that the police took fingernail scrapings from him indicating the presence of blood but claimed that the blood came from an accidental needle stick while injecting drugs. Clark also conceded that he refused to cooperate with the police until granted immunity. Finally, the jury was advised that the State and defense stipulated that both the State and the defense had sought unsuccessfully to secure a sample of Clark's blood.

Boardley contends that the Superior Court erred in requiring a showing of probable cause of criminal activity by Clark in order to secure his blood. As a result of that ruling, Boardley argues that he was deprived of evidence material to his defense. The State agrees that the Superior Court erred in applying the Fourth Amendment's probable cause standard to a request to search and seize evidence of a crime from a third party. The State maintains, however, that the trial court's error cannot be laid at the State's door and that, in any event, the ruling did not subvert the fairness of the trial. We agree.

■ Although a search warrant may not issue except upon a determination of probable cause there is no requirement the owner or possessor of the property to be seized be viewed as a suspect. *Zurcher v. Stanford Daily*, 436 U.S. 547, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978). The Fourth Amendment does not foreclose the issuance of a search warrant directed to a third party not "implicated in misconduct." *Id.* at 559, 98 S.Ct. at 1978. The requirement of probable cause in that context is directed to the relationship between the crime under investigation and the evidence sought to be seized. As long as the search is "reasonable" under the Fourth Amendment, the "State interest in enforcing the criminal law and recovering the evidence remains the same," whether the third party is a suspect or not. *Id.* at 560, 98 S.Ct. at 1979.[2]

---

**2.** The compulsory extraction of blood from any individual, whether a suspect or a witness, is subject to the further requirement that any compulsion required to extract blood not implicate due process concerns. *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966); *Brank v. State,* Del.Supr., 528 A.2d 1185, 1190 (1987).

In requiring the State to establish probable cause that Clark had engaged in criminal activity, the Superior Court was clearly in error. The court should have granted the State's application to seize a small amount of Clark's blood for comparison with that of the victim. While Clark's conduct at the scene was suspicious, and he later proved uncooperative with police, no witness directly implicated him in the shooting. Moreover, it would have seriously undermined the State's case against Boardley if the prosecutor were to state under oath, as a condition of securing a search warrant, that the State had probable cause to suspect Clark of the offenses for which Boardley had been indicted.

■ Although we conclude that the Superior Court erred in its refusal to grant a search warrant for Clark's blood, such error is not attributable to the prosecution. Indeed, short of attesting to Clark's criminal involvement, the State did all that was required in an effort to secure evidence which the defendant claimed was exculpatory. Nor was the defendant entitled to an inference that such evidence if secured would have been exculpatory of his guilt since the absence of such evidence was not the result of the State's failure to gather or preserve it. *Cf. Deberry v. State*, Del. Supr., 457 A.2d 744 (1983); *Hammond v. State*, Del.Supr., 569 A.2d 81 (1989).[3]

■ Boardley contends that the trial court's error was compounded by the State's use of Clark as an immunized witness at trial. Although we agree that the trial court erred in not requiring production of a sample of Clark's blood, we conclude that such error was harmless beyond a reasonable doubt. We also find no prosecutorial overreaching in its grant of immunity enabling Clark to testify for the State.

Clark's conduct at the scene, although unusual, did not give rise to any reasonable inference that he was directly implicated in Thomas' death. There is no evidence that Clark had any contact with the victim, nor with Boardley except to hand him a pack of cigarettes prior to the shooting. It is undisputed that there was only one shot and one assailant. Boardley's sole defense was that he was not at the scene. The evidence to the contrary including the direct eye witness testimony of Williams, who was standing a few feet away from the confrontation, was overwhelming. That testimony together with Boardley's statements shortly after the killing that he had shot a man in an argument rendered the State's case extremely strong. In light of the strength of the State's case, we are convinced beyond a reasonable doubt that any error which precluded a comparison of the blood on Clark's fingernail with that of the victim was harmless and did not affect the verdict.[4] *Michael v. State*, Del.Supr., 529 A.2d 752, 761 (1987).

Additionally, we note that the evidence of Clark's refusal to provide a blood sample as well as his initial refusal to testify were presented to the jury to impeach his testimony and to suggest to the jury that Clark was implicated in the killing. The jury was instructed that because Clark had been granted immunity his testimony should be received with great caution. Boardley's basic defense at trial was that the State had not properly investigated the crime and that the real culprit was Clark whose conduct in refusing to provide a blood sample and securing of immunity suggest that he,

3. Following oral argument, this Court inquired of the State whether, at that time, a blood test could be conducted if this case were remanded to the Superior Court for the purpose of requiring Clark to supply a sample of his blood for testing. The State has advised the Court that the victim's blood sample was "routinely destroyed" by the Medical Examiner's Office and thus is no longer available for comparison with any new sample of Clark's blood.

4. We note that even if Clark had provided a sample of his blood, it would have been of limited relevance. At trial, the State presented the testimony of an FBI serologist who stated that the analysis envisioned by the FBI could only have determined whether two particular samples were of the same genetic "group," not whether they came from the same person. Thus, the best evidence Boardley could have hoped to obtain from the sample was that the blood under Clark's fingernails was of the same genetic group as the victim's, but not necessarily that it was the victim's.

not Boardley, killed Williams. Boardley was afforded a full opportunity to present that defense, notwithstanding the absence of a blood test that might have implicated Clark. *Id.* The jury simply chose to reject that argument in the face of the overwhelming evidence presented by the State. We perceive of no basis to disturb that verdict.

The judgment of the Superior Court is AFFIRMED.