IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| CHAUNCEY S. STARLING, | § | |
| | § | No. 533, 2014 |
| Defendant Below, | § | |
| Appellant, | § | Court Below – Superior Court |
| | § | of the State of Delaware |
| v. | § | in and for New Castle County |
| | § | |
| STATE OF DELAWARE, | § | Cr. ID No. 0104015882 |
| | § | |
| Plaintiff Below, | § | |
| Appellee. | § | |

Submitted: October 7, 2015
Decided: December 14, 2015

Before **STRINE**, Chief Justice; **HOLLAND**, **VALIHURA**, **VAUGHN**, and **SEITZ**, Justices, constituting the Court *en Banc*.

Upon appeal from the Superior Court. **REVERSED**.

James J. Haley, Jr., Esquire, Wilmington, Delaware, Steven H. Brose, Esquire, David M. Fragale (*Argued*), Esquire, Jeremy D. Engle, Esquire (*Argued*), Steptoe & Johnson LLP, Washington, D.C., for Defendant Below, Appellant.

Elizabeth R. McFarlan, Esquire, Maria T. Knoll (*Argued*), Esquire, Karen V. Sullivan, Esquire, Department of Justice, Wilmington, Delaware, for Plaintiff Below, Appellee.

**SEITZ**, Justice, for the majority:

## I.    INTRODUCTION

A masked gunman entered a Wilmington, Delaware barbershop, shot to death his intended victim, and also shot and killed a five-year-old boy.  The police arrested Chauncey Starling one month after the shooting, when the State's key witness, Alfred Gaines, identified Starling as the shooter after Starling allegedly shot Gaines in a separate incident in Chester, Pennsylvania.

In 2003, the State tried Starling for first degree murder, conspiracy, and related weapons charges.  No physical evidence linked Starling to the crime.  Instead, the State relied primarily on Gaines' testimony and statements made to police by Starling's brother and girlfriend.  The State also relied on testimony from the victim's girlfriend, who identified Starling as the shooter based on his eyes.  A Superior Court jury convicted Starling of all charges, and the judge sentenced him to death.  On direct appeal, this Court affirmed the conviction but remanded the case for resentencing.  After remand, the Superior Court again sentenced Starling to death.  We then affirmed the death sentences.

Starling then moved for postconviction relief in the Superior Court.  Starling claimed that his counsel during trial ("Trial Counsel") was ineffective, that the State failed to disclose exculpatory evidence under *Brady v. Maryland*,[1] and that

---

[1] 373 U.S. 83 (1963).

2

the prosecution engaged in misconduct at trial. Following years of discovery, evidentiary hearings, and briefing, the Superior Court on September 5, 2014, denied Starling's motion and this appeal followed. Starling renews the same constitutional arguments on appeal.

With no physical evidence to link Starling to the crimes, it was essential to a fair trial that Trial Counsel use all available impeachment evidence, and make timely and appropriate objections to the admission of evidence going to the heart of the State's case. It was also incumbent on the State to provide Trial Counsel with accurate information about exculpatory evidence relevant to the credibility of the State's central witness. Our review of the record leads us to conclude that mistakes were made that undermine confidence in the fairness of the trial.

First, Starling's Trial Counsel intended to but forgot to examine an eyewitness to the shooting about statements the witness made to an investigator shortly after the shooting. That eyewitness stated that he recalled seeing photographs in the newspaper of the two barbershop shooting suspects, one of which was Starling, and told the investigator that "none of those individuals had the same appearance as the shooter." Second, Trial Counsel failed to object to the State's admission of Starling's brother's statement to police, where after several hours of interrogation the twenty-three year old told police that Starling said he

3

was sorry for what he did to the boy. A substantial argument could have been made that the statement was involuntary and therefore inadmissible.

Finally, before trial the State dismissed a capias and violation of probation ("VOP") charges against Gaines, the State's central witness at trial, but at the time of trial the State represented to Trial Counsel that the charges remained "pending." We have long held that whenever the State reduces pending charges against any State witness, whether the charges are related to the crime at trial or not, disclosure to the defense is mandatory.[2] Instead of providing accurate information, the State misinformed Trial Counsel about the status of Gaines' charges. This mistake, unintentional as it was, deprived the defense of important evidence that might have been used to attack the credibility of the State's main witness.

The cumulative effect of each of these errors leads us to conclude that there is a reasonable probability that the outcome of the trial would have been different without the errors. Therefore we reverse Starling's conviction and remand for a new trial.

---

[2] *See, e.g.*, *Michael v. State*, 529 A.2d 752, 756 (Del. 1987).

4

## II.   BACKGROUND[3]

### A. The Shooting

On March 9, 2001, at about 8:30 p.m., several patrons were in the Made 4 Men Barbershop in Wilmington.  A masked gunman wearing a black hooded sweatshirt entered the barbershop and opened fire on Darnell Evans, who was sitting in a barber's chair near the entrance.  Evans ran to the back of the barbershop, and the shooter followed him.  After Evans fell to the ground, the shooter stood over Evans and shot him twice in the head.  Evans suffered "five gunshot wounds to the head, chest, abdomen, and groin."[4]  At some point, five-year-old Damon Gist, Jr., who was there with his father, was shot in the jaw.  Both Evans and Gist died from their wounds.

The barbershop's owner, Lawrence Moore, initially pursued the shooter, but ultimately abandoned the chase.  Although Moore and the barbershop patrons witnessed the shooting, none of them could identify the shooter by name.  The police did not recover any DNA, fingerprints, or the murder weapon.

On April 7, 2001, Pennsylvania police discovered Alfred Gaines in Chester, Pennsylvania.  Gaines had been shot multiple times around 11:18 p.m. and was in possession of crack cocaine.  He was also in violation of his probation in

---

[3] Unless otherwise noted, the following facts are taken from the Superior Court's opinion, *State v. Starling*, 2014 WL 4386127 (Del. Super. Sept. 5, 2014).

[4] *Id.* at *1.

Delaware, which, among other things, forbade him from leaving the State of Delaware, possessing controlled substances, or being out after 10:00 p.m. After police arrested him for violation of his probation and possession of crack cocaine, Gaines told detectives that Starling was the person who shot him, and that Starling had also committed the barbershop shooting. Starling had allegedly been pursuing Gaines because Gaines had shot an acquaintance of Starling's the day before in Wilmington.

In November 2001, a grand jury indicted Starling for the barbershop shooting. Starling was charged with two counts of first degree murder, two counts of possession of a firearm during the commission of a felony, and one count of first degree conspiracy.

## B. Starling's Trial

The State's primary witness was Gaines, who testified that he was with Starling and Richard Frink on the evening of the shooting. He testified that the three men were driving around Wilmington and that when they passed the barbershop, Frink saw Evans through the window. According to Gaines, Starling then exited the car, tucked a gun into his pants, and said he was going to "put in some work," which Gaines interpreted to mean that Starling would shoot or fight

6

someone.[5] Gaines testified that Starling was dressed in all dark clothing and wearing a black hooded sweatshirt. According to Gaines, after fifteen minutes, Starling came back to the car where Gaines and Frink had remained and said, "I got him. I got him. I think I got a little boy, too."[6] Gaines testified that Frink then drove Gaines home.

Gaines also testified that Starling called him the evening of the shooting, because Starling was upset and wanted to talk. Gaines apparently took a taxi to meet Starling at the home of Vicki Miller, Starling's girlfriend. Gaines testified that Starling "was a wreck" and mentioned shooting "a little boy."[7] Starling's brother Michael was present, and Gaines alleged that both he and Michael heard Starling say he was sorry for what he did to the boy. Michael drove Gaines home.

At trial, the State introduced Michael's statement to police detectives obtained during his interrogation on April 27, 2001.[8] Several days earlier, Michael, who was twenty-three years old at the time, had been arrested and held in custody for six or seven hours before being released.[9] Then, on April 27, police came to Michael's workplace and drove him to the station for questioning. The detectives took Michael's cell phone, would not let him make phone calls, and

---

[5] App. to Opening Br. at 532-33 (Trial Test. of A. Gaines, Oct. 16, 2003).
[6] *Id.* at 535.
[7] *Id.* at 536.
[8] *Id*. at 582 (Trial Tr., Oct. 17, 2003).
[9] *Id.* at 574-75 (Trial Test. of M. Starling, Oct. 17, 2003).

7

ignored his repeated requests for his mother.[10] Michael at first denied that his brother was involved in the shooting. The Detectives then threatened Michael with criminal charges and suggested that he could spend the rest of his life in jail for crimes he did not commit,[11] or in the alternative, obstruction of justice.[12] The police told Michael that his brother had confessed. They questioned Michael extensively, reiterating that everyone else's story was the same, and told Michael repeatedly what they wanted him to say—that Starling said the night of the shooting he was sorry for what he did to the boy.[13] After being told he could see his mother and the questioning would end when he repeated the statement back, Michael finally told the detectives that Starling had said he was sorry for what he did to the boy.[14] The State introduced Michael's statement at trial without

---

[10] *Id.* at 574; *id.* at 313 (Interview of M. Starling, Apr. 27, 2001) ("Where's my mom?"); *id.* at 326 ("Can I see my mom?").

[11] *Id.* at 284 ("[D]on't get dragged into something [i.e. the barbershop shooting] that you weren't there for [because] that's what's gonna happen."); *id.* at 289, 291 ("The bottom line is don't drag yourself down the sewer when you weren't even there! Unless you want to get charged? I don't think you're that you know, you're not that stupid are you? You don't have to take a charge for something you didn't do? Particularly when you don't have to."); *id.* at 294 ("Mike, you are a smart man, don't throw your life away for something you weren't involved in."); *id.* at 1590 (Evidentiary Hr'g Tr., Test. of Det. Mullins, Nov. 29, 2012) ("Q. Did you or did Detective Sullivan threaten Michael with being criminally charged in connection with something he didn't do? . . . A. Yeah I guess.").

[12] *Id.* at 285 ("You ever heard of obstruction of justice?").

[13] *Id.* at 289 ("I know what was said . . . but the bottom line is I need to hear it from you."); *id.* at 294 ("It's over with, . . . your brother made a very big mistake, he knows it, he's sorry for it, no one intended for the little kid to get killed but it happened."); *id.* at 302, 310, 317, 319, 320-21, 325, 326, 327, 332, 344.

[14] App. to Opening Br. at 305, 332, 348-49.

8

objection and without a determination by the trial judge that the statement was voluntary.

Shaylynn Flonnory, Evans' girlfriend, made an in-court identification of Starling. She claimed that she was standing outside the barbershop right before the shooting and that she saw the shooter dressed in all black, including a black hooded sweatshirt, holding a gun. Flonnory testified that she saw the shooter's eyes through the openings in the shooter's mask. At trial, she identified Starling as the shooter based on his eyes.

The jury convicted Starling on each count of the indictment on October 22, 2003.[15] On November 4, 2003, the jury concluded that the aggravating factors outweighed the mitigating factors and unanimously recommended the death penalty. The Superior Court agreed with this recommendation and sentenced Starling to death on June 10, 2004.[16]

### C. Starling's Direct Appeal

In his direct appeal, Starling raised a number of arguments relating to the jury venire, use of peremptory challenges, and denial of his Fifth Amendment right against self-incrimination. He also challenged the constitutionality of Delaware's death-penalty statute under the Sixth Amendment, as well as the Superior Court's

---

[15] *Starling v. State*, 882 A.2d 747, 752 (Del. 2005).
[16] *State v. Starling*, Cr. ID No. 0104015882 (Del. Super. June 10, 2004).

sentencing decision. Further, Starling argued that the prosecution failed to disclose Miller's statement to police, "den[ying] that Starling admitted anything to her or that she saw Starling on the night of the shootings."[17]

This Court affirmed the convictions but vacated the death sentences because the Superior Court judge "erred as a matter of law by stating that he was 'directed' to give the recommendation great weight."[18] This Court then remanded the case to the Superior Court for resentencing. The Superior Court resentenced Starling to two death sentences on October 2, 2005. We affirmed those sentences on appeal.[19]

### D. Starling's Motion For Postconviction Relief

In April 2007, Starling filed three *pro se* Rule 61 motions for postconviction relief.[20] The Superior Court appointed counsel, who filed an Amended Petition for Postconviction Relief on April 1, 2008. During the next six years, the Superior Court held numerous hearings on various petitions and responses.

At the postconviction relief hearings, Starling's post-conviction counsel examined various individuals involved in his prosecution between 2001 and 2004. On November 26, 2012, one of the prosecutors testified about her recollections of dealing with the potential extradition of Gaines after he was shot in Chester, and of

---

[17] *Starling*, 882 A.2d at 751.
[18] *Id.* at 759.
[19] *Starling v. State*, 903 A.2d 758, 767 (Del. 2006).
[20] *Starling*, 2014 WL 4386127, at *2.

10

a possible cooperation agreement with Gaines.[21] The prosecutor was not able to recall many details about her work on the case. She did, however, testify that she requested that the Superior Court withdraw a pending capias and VOP charges against Gaines such that he would not be extradited to Delaware.[22] The lead prosecutor also testified. He testified that he believed and told Trial Counsel before trial that Gaines' VOP was "pending" and "we weren't doing anything or that nothing was being done with them, they were being held in abeyance until after his trial . . . ."[23]

Trial Counsel also testified and submitted an affidavit. Trial Counsel testified that he was not aware that the State had asked the Superior Court to withdraw the capias and Gaines' VOP charges. Trial Counsel said that the State provided him with a summary of Gaines' prior criminal history just before trial, which listed Gaines' VOP charges as pending. Trial Counsel also testified that he forgot to ask Moore about the statements Moore made to an investigator—that neither of the photographs in the newspaper of suspects in the barbershop shooting, one of which was Starling, looked like the shooter. Moore had also described the shooter as substantially taller than Starling. According to Trial Counsel, Moore's opinion that Starling did not look like the shooter "was something that obviously

---

[21] App. to Opening Br. at 1178-273.
[22] *Id.* at 1229.
[23] *Id.* at 1333.

11

was favorable to the defense."[24] Additionally, Trial Counsel admitted that his failure to cross-examine Moore about it "certainly wasn't strategic or tactical."[25] Finally, Trial Counsel testified that he believed Michael's statement was coerced and involuntary, but that rather than object to its admission, he sought to let the jury decide whether to believe it by playing them the recording of the entire interview.

Starling based his Rule 61 motion on various grounds. We discuss only those necessary to resolve this appeal. First, Starling argued that Trial Counsel was ineffective for failing to examine Moore on his statements to an investigator. The Superior Court concluded that Trial Counsel was not ineffective for failing to do so because Starling failed to establish how "Moore's testimony would have altered the outcome of Starling's trial."[26] The Court noted that various eyewitnesses testified regarding the shooter's height and weight, and Starling made no showing that Moore's additional testimony "would have altered the jury's perception of the shooter's body type in a way that would have produced a different trial outcome."[27]

---

[24] *Id.* at 1840.

[25] *Id.* ("I recall filling out the affidavit, shaking my head, I missed it, how did I miss it, I have no clue."). Despite Trial Counsel's attempts to recall Moore to the stand after realizing the mistake, he was unable to locate Moore. *Id.* at 1840-42; *id.* at 921.

[26] *Starling*, 2014 WL 4386127, at *10.

[27] *Id.* The record indicates that Starling had only one attorney representing him at trial.

12

Second, Starling asserted that Trial Counsel was ineffective for failing to object to the State's admission of Michael's statement to detectives into evidence. The Superior Court also rejected this argument. It observed that the tape's introduction "permitted the jury to consider the credibility of Michael's confession, thus providing potentially exculpatory evidence for Starling."[28] Third, Starling argued that the State violated its obligation under *Brady v. Maryland* by withholding information useful to impeach Gaines' testimony. At the recommendation of Gaines' probation officer and the request of the Delaware Attorney General's office, the State withdrew Gaines' capias and VOP charges on October 17, 2001.[29] The Superior Court first concluded that Rule 61(i)(3) barred this claim.[30] On the merits, the Superior Court accepted the State's assertion that it made no deal with Gaines, and concluded that the State allowed Gaines to remain in Pennsylvania because of safety concerns related to Starling's alleged shooting of Gaines in Chester.[31] The Superior Court also explained that "disclosure was not

---

[28] *Id.* at *11.
[29] App. to Opening Br. at 358 (Probation Progress Report, Oct. 16, 2001).
[30] *Starling*, 2014 WL 4386127, at *3.
[31] *See id.* at *5 ("According to the State, there was no deal between the State and Gaines. The Court accepts the representations of the prosecutors who emphatically disclaimed that there was any deal with Gaines and stated firmly that no promises had been made to Gaines in exchange for his testimony.").

13

mandated because Trial Counsel . . . knew that Gaines' probation had been discharged."[32]

The Superior Court rejected these arguments for postconviction relief and his other claims. Starling renews the same claims on appeal.[33]

## III. ANALYSIS

We review the Superior Court's denial of a motion for postconviction relief for abuse of discretion.[34] We review ineffective assistance of counsel claims and alleged *Brady* violations *de novo*.[35]

### A. The *Strickland* Standard

In *Strickland v. Washington*, the United States Supreme Court established a two-pronged test for ineffective assistance of counsel claims:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This

---

[32] *Id.*

[33] Starling raises a host of other claims that we need not and do not reach. These include: (i) that Trial Counsel was ineffective for failing to object to the in-court identification of Starling by a witness, Shaylynn Flonnory; (ii) that the State violated *Brady* by failing to disclose Frink's cell phone records, which Starling claimed he could have used to impeach Gaines; (iii) that the State engaged in prosecutorial misconduct by arguing in its rebuttal closing argument that Starling ignored incoming calls on his cell phone around the time of the barbershop shooting; and (iv) that the State violated *Brady* by failing to disclose a statement Vicki Miller made to police on April 19, 2001.

[34] *Ploof v. State*, 75 A.3d 811, 820 (Del. 2013).

[35] *Id.*

14

requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.[36]

We evaluate Starling's ineffective assistance of counsel claims using this approach, determining whether Trial Counsel was deficient and, if so, whether Starling suffered prejudice from the ineffectiveness. Defense counsel is deficient where counsel's representation falls below an objective standard of reasonableness.[37] To demonstrate prejudice caused by counsel's ineffectiveness, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[38] A reasonable probability of a different result means a "probability sufficient to undermine confidence in the outcome," a standard lower than "more likely than not."[39] "The likelihood of a different result must be substantial, not just conceivable."[40]

### B. Starling's Trial Counsel Was Ineffective For Failing To Elicit Exculpatory Evidence From Moore

Starling argues that Trial Counsel was ineffective for failing to cross-examine Moore about his exculpatory statements. As the only person who saw the shooter during the shooting and chased him afterward, Moore had the best

---

[36] *Strickland v. Washington*, 466 U.S. 668, 687 (1984).
[37] *Gattis v. State*, 697 A.2d 1174, 1178 (Del. 1997).
[38] *Strickland*, 466 U.S. at 694.
[39] *Id.* at 693-94.
[40] *Harrington v. Richter*, 562 U.S. 86, 112 (2011) (citing *Strickland*, 466 U.S. at 693, 697).

15

opportunity to identify him.[41] According to an investigator's report, Moore stated during an interview, after seeing the newspaper photographs of two suspects in the barbershop shooting, one of which was Starling, that neither of the photographs looked like the shooter, and that the shooter was substantially taller than Starling.[42] Trial Counsel forgot to ask Moore about these exculpatory statements during cross-examination. In his testimony during postconviction proceedings, Trial Counsel testified that Moore's opinion that Starling did not look like the shooter "was something that obviously was favorable to the defense."[43] Additionally, Trial Counsel testified that his failure to cross-examine Moore about it "certainly wasn't strategic or tactical."[44] The Superior Court nonetheless determined that Trial Counsel's representation was effective because "[t]here is no requirement that Trial Counsel elicit all possible evidence at trial."[45]

---

[41] Moore stated to an investigator that "he believes that he was the only person in the shop at the time who stood and watched the entire incident unfold." App. to Opening Br. at 361 (Memo re L. Moore).

[42] *Id.* ("Mr. Moore states that he recalls seeing photographs of individuals . . . who were suspected of the crime and/or charged . . . [and] none of those individuals had the same appearance as the shooter."). Moore stated that the shooter was approximately 6'1" or 6'2" when he was interviewed on December 20, 2001, *id.* at 360, and testified at trial that the shooter was about 5'11", *id.* at 496 (Trial Test. of L. Moore, Oct. 15, 2003). Starling is 5'6". *Id.* at 630 (Trial Test. of K. Taylor, Oct. 21, 2003).

[43] App. to Opening Br. at 1840.

[44] *Id.* ("I recall filling out the affidavit, shaking my head, I missed it, how did I miss it, I have no clue.").

[45] *Starling*, 2014 WL 4386127, at *10.

16

It is correct, as a general matter, that trial counsel does not have to elicit all possible evidence at trial. But where eyewitness testimony played a central role in the State's case, and no physical evidence linked Starling to the crime, Trial Counsel's failure to use important exculpatory evidence fell below any objective standard of reasonableness and was ineffective representation. Trial Counsel had in hand a private investigator's report where eyewitness Moore, who claimed to be the only witness to view the entire incident, recounted to the investigator that he saw two photographs of the shooting suspects, one of which was Starling, and said that "none of those individuals had the same appearance as the shooter."[46] Despite attempts by Trial Counsel to recall Moore to the stand after realizing the mistake, Trial Counsel could not locate Moore.[47] Forgetting to examine a witness on critical exculpatory eyewitness testimony was ineffective assistance of counsel.

The Superior Court determined that Starling failed to demonstrate actual prejudice from the mistake because "the jury heard various pieces of testimony on the height and stature of the shooter" and Moore's testimony would not have "altered the jury's perception of the shooter's body type in a way that would have produced a different trial outcome."[48] We disagree. Moore arguably had the best view of the shooter. The jury could have found Moore's description of the

---

[46] App. to Opening Br. at 360-62 (Memo re L. Moore).
[47] *Id.* at 1840-42; *id.* at 921.
[48] *Starling*, 2014 WL 4386127, at *10.

17

shooter's physical characteristics the most reliable, which would have been favorable to Starling. The jury could have also used Moore's testimony to aid in its evaluation of other eyewitness testimony offered by the State.

For instance, Moore's initial recollection of the shooter's height was 6'1" or 6'2." Starling is 5'6."[49] Charrod Ali Batts and Damon Gist, Sr., also eyewitnesses, gave conflicting testimony about the shooter's appearance. Batts testified that the shooter "wasn't too tall" and "wasn't too short," but rather was "probably the same size as me if not a little bit shorter."[50] Batts testified that he is 5'8" or 5'9."[51] Gist, on the other hand, testified closer to Moore that the shooter was 5'11" or 6'0."[52] Moore also believed the shooter was "about 200, 205" pounds, which differed from Gist's recollection of "around 170."[53]

Given the serious conflict among the eyewitnesses about the shooter's appearance, and the lack of any physical evidence connecting Starling to the crime, Trial Counsel's failure to elicit important exculpatory testimony from the witness with perhaps the best vantage point to view the shooter caused serious prejudice to Starling's defense.

---

[49] App. to Opening Br. at 630 (Trial Test. of K. Taylor, Oct. 21, 2003).
[50] *Id.* at 488 (Trial Test. of A. Batts, Oct. 15, 2003).
[51] *Id.*
[52] *Id.* at 506 (Trial Test. of D. Gist, Oct. 15, 2003); App. to Answering Br. at 1 (Transcribed Statement of D. Gist).
[53] App. to Opening Br. at 506 (Trial Test. of D. Gist, Oct. 15, 2003). Batts testified that the shooter had a "medium build." *Id.* at 490, 506 (Trial Test. of A. Batts, Oct. 15, 2003).

18

## C. Starling's Trial Counsel Was Ineffective For Not Objecting To Michael Starling's Statement

Starling asserts that Trial Counsel was ineffective for failing to object to the State's admission into evidence of Michael's pre-trial statement. As explained previously, during interrogation by two detectives two months after the shooting, Michael told police that he heard Starling say that he was sorry for what he did to the boy. Without objection, the State entered the statement into evidence at the conclusion of a detective's examination, not during Michael's examination as required by the statute. Trial Counsel never asked the court to make a threshold voluntariness determination, and none was made by the trial court.[54]

Under § 3507 of the Delaware Criminal Code, "[i]n a criminal prosecution, the voluntary out-of-court prior statement of a witness who is present and subject to cross-examination may be used as affirmative evidence with substantive independent testimonial value."[55] The General Assembly enacted the statute to allow the statements of turncoat witnesses to be admitted into evidence.[56] The statement must be voluntary to be admissible.[57] The voluntariness requirement

---

[54] There is some confusion in the briefs and in the record regarding which party actually introduced the tapes, but Trial Counsel made the decision to play the tapes for the jury. *Id.* at 613-15 (Trial Tr., Oct. 21, 2003).

[55] 11 *Del. C.* § 3507(a).

[56] *Collins v. State*, 56 A.3d 1012, 1019 (Del. 2012).

[57] *Taylor v. State*, 23 A.3d 851, 853 (Del. 2011).

ensures that coercion by improper conduct does not taint the reliability of these statements.[58]

There are certain threshold requirements to admissibility that must be met before the statement can be heard by the jury:

> A statement offered under Section 3507 must be offered before the conclusion of the direct examination of the declarant. The prosecutor must inquire about the voluntariness of the statement during the direct examination of the declarant, and the judge must make a ruling on whether the declarant made the statement voluntarily before the statement may be submitted to the jury for consideration.[59]

"Determining whether a statement was voluntary requires a 'careful evaluation of all the circumstances of the interrogation.'"[60] For a statement to be involuntary, it must have been obtained by tactics that are so coercive as to "overbear the person's will and rational thinking processes."[61] A statement obtained by threats can be involuntary.[62]

The Superior Court ruled that Starling essentially waived this claim because "Trial Counsel introduced the tape himself," and in any event introduction of the

---

[58] *See State v. Rooks*, 401 A.2d 943, 946 (Del. 1979) ("[T]he possibility of coercion by improper conduct is no less present in out-of-court statements of witnesses than it is in out-of-court confessions by defendants . . . ."); *Hatcher v. State*, 337 A.2d 30, 32 (Del. 1975).

[59] *Dunn v. State*, 2014 WL 4698488, at *2 (Del. Sept. 22, 2014); *Woodlin v. State*, 3 A.3d 1084, 1087 (Del. 2010) ("[T]he trial judge 'must be satisfied that the offering party has shown by a preponderance of the evidence that the statement was voluntarily made, and must render an explicit determination on the issue before admitting it for the jury's consideration.'") (quoting *Hatcher*, 337 A.2d at 32).

[60] *Flowers v. State*, 858 A.2d 328, 330 (Del. 2004) (quoting *Rooks*, 401 A.2d at 948).

[61] *Rooks*, 401 A.2d at 948.

[62] *Id.* at 947 (citing *State v. Winsett*, 205 A.2d 510, 521 (Del. Super. 1964)).

tape "was not objectively unreasonable because Michael's taped interview permitted the jury to consider the credibility of Michael's confession, thus providing potentially exculpatory evidence for Starling."[63] We disagree with the Superior Court and determine that counsel's failure to object to Michael's statement was ineffective and caused material prejudice to Starling's defense.

As an initial matter, the record contradicts the finding of waiver. The State moved the admission of Michael's statement, not Starling.[64] Trial Counsel did thereafter play the full interview for the jury, but only after the statement was in evidence.[65] Trial Counsel's decision to play the entire interrogation for the jury, rather than being a tactical decision, is better described as damage control after failing to object. It is also no answer to say, as the State claims and as the Superior Court held, that Starling delegated to the jury the voluntariness determination. Under § 3507 the voluntariness determination is the exclusive province of the trial judge, not the jury.[66] Although we need not determine at this juncture whether Michael's statement was voluntary, serious doubt existed about the voluntariness of Michael's statement such that Trial Counsel should have objected and insisted

---

[63] *Starling*, 2014 WL 4386127, at *11.
[64] The State introduced the tapes without objection from Trial Counsel. App. to Opening Br. at 582 (Trial Tr., Oct. 17, 2003).
[65] *Id*. at 615 (Trial Tr., Oct. 21, 2003).
[66] *Woodlin*, 3 A.3d at 1087.

21

that the statute's requirements be satisfied, including a voluntariness determination by the trial court.

If there had been an objection, the trial judge would have had to determine, under the totality of the circumstances, whether Michael's "will was so overborne that the statements produced were not the product of a rational intellect and free will."[67] This is a fact-specific inquiry where the trial judge "consider[s] the specific tactics utilized by the police in eliciting the admissions, the details of the interrogation, and the characteristics of the defendant."[68]

In this case, Michael found himself surprised by a "hallway full of cops" at his workplace who took him away for interrogation.[69] He was then held at the police station for approximately five or six hours and interrogated by two detectives.[70] Michael was not read his *Miranda* rights. Michael was not allowed to make any phone calls.[71] While in custody, Michael repeatedly asked to speak to

---

[67] *Roth v. State*, 788 A.2d 101, 108 (Del. 2001) (quoting *Martin v. State*, 433 A.2d 1025, 1032 (Del. 1981)); *see also Collins*, 56 A.3d at 1018.

[68] *Baynard v. State*, 518 A.2d 682, 690 (Del. 1986); *see also id.* ("Factors which bear on these circumstances include the following: 'the youth of the [declarant]; his lack of education or his low intelligence; the lack of any advice to the [declarant] of his constitutional rights; the length of detention; the repeated and prolonged nature of the questioning; and the use of physical punishment such as the deprivation of food or sleep.'") (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)).

[69] App. to Opening Br. at 620 (Trial Test. of M. Starling, Oct. 21, 2003).

[70] *Id.* at 575 (Trial Test. of M. Starling, Oct. 17, 2003).

[71] *Id.* at 574.

his mother,[72] who the police promised would be arriving shortly (though she did not).[73] The police also told Michael exactly what they wanted to hear him say: "[W]e already know what happened, we know the story, but we know that he told you [sic] that he was sorry for I just need to hear it from you! And we're done!"[74]

The police then repeatedly threatened to charge Michael with crimes if he did not say what they wanted to hear.[75] Specifically, the police told him that he could be charged with the barbershop murders, telling him: "The bottom line is don't drag yourself down the sewer when you weren't even there! Unless you want to get charged? . . . You don't want to take a charge for something you didn't do? Particularly when you don't have to."[76] The police also threatened to charge

---

[72] *Id.* at 574; *id.* at 313 (Interview of M. Starling, Apr. 27, 2001) ("Where's my mom?"); *id.* at 326 ("Can I see my mom?").

[73] *Id.* at 183 ("[S]he's on her way in here, alright . . . .").

[74] *Id.* at 310.

[75] *See, e.g.*, App. to Opening Br. at 267 (Interview of M. Starling, Apr. 27, 2001) ("I don't think you want to get caught up in it. Trust me on this one."); *id.* at 268 ("Bottom line is you don't want to get dragged in on this man, okay? Alright?"); *id.* at 269 ("What I'm telling you is, don't lie because you don't want to get caught up in this, alright?"); *id.* at 282 ("Because we know the answer Michael and I don't want to see you get jammed up. . . . Michael, we know the answer but I don't want to see you get jammed up on this."); *id.* at 284 ("You are not a suspect in anything, but don't get dragged into something that you weren't there for cause that's what's gonna happen"); *id.* at 288 ("Nobody wants to go to jail for something they didn't do Michael, and I hope you're on the same page."); *id.* at 290 ("I know, but the thing is don't involve yourself in a double murder investigation."); *id.* at 336 ("[A]nd I explained it to you from the beginning, don't get jammed up in this.").

[76] *Id.* at 291.

23

Michael with obstruction of justice.[77] The police admitted to making these threats: "Q. Did you or did Detective Sullivan threaten Michael with being criminally charged in connection with something he didn't do? . . . A. Yeah I guess."[78] Michael testified at trial that "[he] just told them what they wanted to hear, or [he] believed he] was going to . . . jail."[79] In the face of substantial evidence pointing to the involuntariness of Michael's statement, Trial Counsel did not object and did not invoke the procedural requirements of § 3507.

Finally, the State argues that Trial Counsel's testimony reflects that the failure to object was a tactical decision, and should not be second-guessed by this Court. Trial Counsel stated that, because he believed that the statement was admissible under § 3507, he "sought to suggest to the jury that it had been the product of coercion by the interviewing detectives."[80] Some judgments made by trial counsel, however, are so far out of the realm of reasonable trial strategy that they qualify as ineffective assistance.[81] Trial Counsel recognized that Michael's statement "was the biggest problem for the defense case [and] was the best part of

---

[77] *See id.* at 285 ("You ever heard of obstruction of justice?"); *id.* at 281 ("Now don't be pretty sure cause a lot of that's gonna depend on whether or not you're hindering okay a police investigation and that's not good Michael . . . .").

[78] *Id.* at 1590 (Evidentiary Hr'g Tr., Test. of Det. Mullins, Nov. 29, 2012).

[79] *Id.* at 623 (Trial Test. of M. Starling, Oct. 21, 2003).

[80] *Id.* at 921-22.

[81] Trial Counsel harbored doubts about the voluntariness of Michael's statement. *See id.* at 1806 (interrogation was "very, very suggestive, very coercive"); *see also id.* (Trial Counsel agreed Michael's statement "wasn't a voluntary and intelligent description of the alleged events").

the prosecution case."[82]  Trial Counsel would have risked nothing by objecting to

Michael's statement and forcing the State to follow the requirements of § 3507 and

prove voluntariness.  Even if the trial court overruled Starling's objection, Trial

Counsel would still have been able to play the full tape for the jury and argue

involuntariness.  As such, Trial Counsel's performance fell below the standard of

objectively reasonable performance and prejudiced Starling's right to a fair trial.[83]

### D. The State Violated *Brady* By Telling Trial Counsel That Gaines' Capias And VOP Were Pending During Trial

Starling argues that the State violated its obligation to provide accurate

information to the defense and to disclose exculpatory information under *Brady*

about the disposition of Gaines' capias and VOP charge.  The State argues in

response, and the Superior Court agreed, that the claim was procedurally barred,

and also without merit because Trial Counsel was allegedly aware of the dismissal

---

[82] App. to Opening Br. at 1800-01.

[83] Other courts have held that Trial counsel's unjustified failure to object to the admission of evidence or testimony that is highly detrimental to the defense prejudices the defendant, and does not satisfy the minimum requirements of *Strickland*.  *See, e.g.*, *Thomas v. Varner*, 428 F.3d 491, 501 (3d Cir. 2005) ("[F]ailure to move to suppress or otherwise object to an in-court identification by the prosecution's central witness, when there are compelling grounds to do so, is not objectively reasonable representation . . . ."); *Henry v. Scully*, 78 F.3d 51, 53 (2d Cir. 1996) (finding ineffective assistance of counsel arising from several unjustified "instances of inaction" by trial counsel where he failed to object to a co-defendant's testimony against the defendant and to hearsay testimony that "explained away" defendant's strongest argument at trial); *Tomlin v. Myers*, 30 F.3d 1235 (9th Cir. 1994) (finding ineffective assistance of counsel where trial counsel failed to object to an in-court identification of the defendant that was based on an earlier unconstitutional and illegal live line-up); *Commonwealth v. Costa*, 742 A.2d 1076, 1077 (Pa. 1999) ("Trial counsel failed to object to [an] impermissible reference to appellant's post-arrest silence.  No reasonable basis exists for that failure.").

before trial. The Superior Court also found that Trial Counsel would not have used the impeachment evidence to avoid opening the door to other evidence unhelpful to Starling's case. After our review of the record, we hold that the claim was not procedurally barred. We also find that the State violated *Brady* by inaccurately describing the status of Gaines' criminal charges, and the error caused material prejudice to the defense.

Gaines was a probationer when he was shot in Chester, Pennsylvania. The terms of his probation required him to remain in Delaware, to observe a 10:00 p.m. curfew, and not to consume or possess controlled substances.[84] Gaines' probation officer, Jason Garrick, secured a capias for his arrest and instituted a VOP charge after Gaines was shot because Gaines was out of state, out of his house after his curfew, and possessed crack cocaine at the time he was shot.[85] Garrick recommended that Gaines be extradited, his probation be revoked, and he be returned to Delaware to serve out the remainder of his prison sentence.[86] The State also filed a detainer against Gaines and obtained an extradition order to allow Gaines to be taken into custody upon his release from prison in Pennsylvania after being held on charges of possessing crack cocaine.[87]

---

[84] App. to Opening Br. at 185 (Capias for A. Gaines Issued Apr. 18, 2001).
[85] *Id.* at 184-89.
[86] *Id*. at 1727.
[87] *Id*. at 1728.

After a prosecutor spoke to Officer Garrick about Gaines' shooting in Chester, Officer Garrick wrote in Gaines' October 16, 2001 probation progress report: "After speaking with [the assistant attorney general], she advised me that she spoke to Your Honor and requested that [Gaines'] VOP and Capias be withdrawn.  This Officer is respectfully recommending that Your Honor withdrawal [sic] the VOP and Capias on Mr. Gaines."[88]  The first prosecutor who made the request was one of the prosecutors in Starling's case.  She testified that Gaines' VOP and capias were withdrawn because Gaines was physically unable to return to Delaware.[89]  The court dismissed the capias and the VOP charge,[90] and allowed Gaines to stay in Pennsylvania while he recovered from his injuries.  Gaines was no longer reporting to his probation officer, but was instead allegedly "being supervised by the Attorney General's Office."[91]

---

[88] *Id.* at 358-59 (Probation Progress Report for A. Gaines).

[89] The deputy attorney general testified that she did so only because Gaines was not going to be able to comply with his parole because he had been shot.  *See id.* at 1229 ("I recall that we contacted the Court and asked the capias and violation of probation be withdrawn because, at that time, Alfred Gaines was either in the hospital or not able to come to Delaware because he had been injured."); *id.* ("I don't know how the capias and VOP, what the process was to have it withdrawn, if it was at a hearing.  I don't recall the specifics of that.  I recall only the general nature of that.  That we asked the Court to withdraw the capias and VOP because Gaines was not able to comply because he'd been shot.").

[90] *Id.* at 919 (Super. Ct. Crim. Docket, Mar. 13, 2008).

[91] *Id.* at 397-99 (Progress Report Disposition, Mar. 27, 2002).  The lead prosecutor's testimony suggested that the idea that Gaines was "being supervised by the Attorney General's Office" may have been wrong.  *Id.* at 1344 ("[W]e weren't supervising anybody.").

After the dismissal of charges, but before trial, the first prosecutor did not inform Trial Counsel of the dismissal of the capias and VOP charges, and the second prosecutor, who was unaware of the dismissal, incorrectly told Trial Counsel that Gaines' VOP was still pending, and would be held in abeyance until after his trial.[92] The prosecution also provided Trial Counsel with a summary of Gaines' prior criminal history, which listed Gaines' VOP as "pending."[93]

### 1. *No Procedural Bar To Starling's Capias/VOP Brady Claim*

Superior Court Criminal Rule 61 generally bars claims that were not raised on direct appeal. Specifically, Rule 61(i)(3) provides that "[a]ny ground for relief that was not asserted in the proceedings leading to the judgment of conviction . . . is thereafter barred, unless the movant shows (A) [c]ause for relief from the procedural default and (B) [p]rejudice from violation of the movant's rights."[94]

As it stood when Starling filed his claim, Rule 61(i)(5) exempts from this procedural bar "a colorable claim that there was a miscarriage of justice because of a constitutional violation that undermined the fundamental legality, reliability,

---

[92] *Id.* at 1332-33.

[93] *Id.* at 456-59 (A. Gaines' Rapsheet, Apr. 15, 2002); *id.* at 1722-23. Gaines' rapsheet was generated on October 14, 2003 and provided to the defense some time on or shortly after that date. *Id.* at 1723. The guilt phase of Starling's trial started on October 15, 2003 and the jury returned a guilty verdict on October 22, 2003.

[94] Super. Ct. Crim. R. 61(i)(3).

28

integrity or fairness of the proceedings leading to the judgment of conviction."[95]

"To invoke this exception, there must be both a claim of a constitutional violation, and a showing that the claim is 'colorable.'"[96] When considering a *Brady* claim, which is a constitutional claim, "[a] colorable claim of a [*Brady*] violation falls within this exception."[97] "When the *Brady* rule is violated, postconviction relief cannot be barred by Rule 61(i)(3) because a *Brady* violation undermines the fairness of the proceeding leading to the judgment of conviction."[98]

Because Starling had alleged a colorable claim of a *Brady* violation, that claim was not barred by Rule 61(i)(3) as it existed when the claim was filed.

2. *The State Violated Brady By Representing To Trial Counsel That Gaines' VOP And Capias Were Pending During Trial*

In *State v. Wright*, we recently set forth the proper analysis for evaluating a *Brady* claim:

> Under *Brady* . . . , the State's failure to disclose exculpatory and impeachment evidence material to the case violates a defendant's due process rights. The reviewing court may also consider any adverse effect from nondisclosure on the preparation or presentation of the

---

[95] Super. Ct. Crim. R. 61(i)(5). Although Rule 61(i)(5) was amended on June 4, 2014, we must apply the version that existed at the time Starling filed his Rule 61 motion. *See Collins v. State*, 2014 WL 2609107, at *2 (Del. June 9, 2014) (applying the version of Rule 61(e)(1) "in effect at the time [the defendant] filed his first postconviction motion"); *State v. Jones*, 2013 WL 5372415, at *3 (Del. Sept. 24, 2013) ("[T]he recently amended Rule 61 ha[s] no effect after [the defendant's] initial Rule 61 petition.").

[96] *Taylor v. State*, 32 A.3d 374, 388 (Del. 2011) (quoting Super. Ct. Crim. R. 61(i)(5)).

[97] *State v. Wright*, 67 A.3d 319, 324 (Del. 2013).

[98] *Jackson v. State*, 770 A.2d 506, 515 (Del. 2001).

defendant's case. There are three components of a *Brady* violation: (1) evidence exists that is favorable to the accused, because it is either exculpatory or impeaching; (2) that evidence is suppressed by the State; and (3) its suppression prejudices the defendant. In order for the State to discharge its responsibility under *Brady*, the prosecutor must disclose all relevant information obtained by the police or others in the Attorney General's Office to the defense. That entails a duty on the part of the individual prosecutor to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.[99]

For a *Brady* violation to be material such that it causes prejudice, the defendant need not show that "the disclosure of the suppressed evidence would have resulted in an acquittal."[100] The defendant must show, however, that the suppressed evidence "creates a *reasonable probability* that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."[101] In other words, the suppression of evidence must "undermine[] confidence in the outcome of the trial."[102] We will not reverse a conviction based on a *Brady* violation if there is "overwhelming evidence establish[ing a defendant's] guilt."[103]

In *Michael v. State*,[104] we addressed a *Brady* violation in circumstances similar to this case. Defendant John Michael faced charges of attempted murder. The prosecutor was concurrently prosecuting the victim for driving under the

---

[99] 91 A.3d at 987-88 (quotations and citations omitted).
[100] *Id.* at 988.
[101] *Id.* (quotations omitted) (emphasis in original).
[102] *Id.* (quotations omitted) (citing *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)).
[103] *Jackson*, 770 A.2d at 517.
[104] 529 A.2d 752 (Del. 1987).

30

influence of alcohol in an unrelated criminal prosecution, and allowed the victim to plead guilty to the lesser offense of reckless driving. The prosecutor did not inform the defense of the reduced charge against the victim. The State had not reduced the charges in exchange for testimony at the defendant's trial, and the prosecutor denied any *quid pro quo* for the reduction of charges.[105]

Even in the absence of any *quid pro quo* arrangement, this Court established a mandatory disclosure rule, where the failure to disclose a reduction of related or unrelated charges against a trial witness is a *Brady* violation:

> Whenever the State reduces any pending charges (related or not) or makes any arrangement with any State witness, disclosure is mandatory. The State was required to disclose a reduction in [the victim's] traffic charges and failed to do so.[106]

Our decision in *Michael v. State* leads us to the conclusion that a *Brady* violation occurred here. The first prosecutor secured the dismissal of the capias and VOP charges against Gaines before trial, and did not provide the information to Trial Counsel. The second prosecutor, who was unaware of the dismissal, mistakenly told Trial Counsel before trial that the charges remained pending. The prosecutor who requested dismissal of the charges denied any *quid pro quo* for the

---

[105] *Id*. at 757 n.10.
[106] *Id*. at 756.

dismissal, but was one of the prosecutors in Starling's trial.[107]  The evidence would

also have been material to the defense, where Gaines was the main State's witness

and no physical evidence linked Starling to the murders.[108]  As this Court noted in

*Michael v. State*:

> Evidence which the defense can use to impeach a prosecution witness
> by showing bias or interest, as well as exculpatory evidence, falls
> within the *Brady* rule.  Such evidence is "evidence favorable to an
> accused" so that, if disclosed and used effectively, it might make the
> difference between conviction and acquittal.  The jury's estimate of
> the truthfulness and reliability of a given witness may well be
> determinative of guilt or innocence.  Indeed, it is upon such subtle
> factors as the possible interest of the witness in testifying falsely that a
> defendant's life or liberty may depend.[109]

The Superior Court ruled that the prosecution was not required to disclose

the dismissal of charges because Trial Counsel allegedly knew after reviewing

Gaines' records that Gaines was on probation when Starling shot Gaines, and also

knew that Gaines' probation had been discharged.  The court's ruling, however,

---

[107] *Starling*, 2014 WL 4386127, at*6.  Officer Garrick's memo is clear that the DDOJ sought dismissal of the capias and VOP charges: "After speaking with [the assistant attorney general], she advised me that she spoke to Your Honor and requested that [Gaines'] VOP and Capias be withdrawn."  App. to Opening Br. at 358-59 (Probation Progress Report).

[108] The Superior Court recognized Gaines' central role in this case:
> Mr. Gaines' role as a witness in this case is very important.  His credibility is a
> very significant issue in the case.  The shooter in the barbershop cannot be
> identified, as far as I know.  There was no eyewitness identification of the shooter
> in the barbershop or any other substance such as a fingerprint or DNA or anything
> else linking—that I'm aware of—Mr. Starling to the barbershop, so that puts more
> of a central role on Mr. Gaines.
App. to Opening Br. at 449.

[109] *Michael*, 529 A.2d at 756 (quoting *United States v. Bagley*, 473 U.S. 667, 676 (1985)).

misapprehends Starling's argument. Starling focuses on the State's failure to notify Trial Counsel of the withdrawal of the capias and VOP charges, not Gaines' discharge from probation. Trial Counsel at some time may have seen a report of the probation discharge, but there is no proof that Trial Counsel knew that the capias and VOP charges had been dismissed against Gaines.[110] Perhaps more importantly, Trial Counsel was entitled to and did in fact rely on the prosecution's representation and the summary of charges provided to the defense just before trial. The prosecution told Trial Counsel, and the rap sheet confirmed, that the VOP charges were pending at the time of trial and would remain pending until after trial.[111] In fact, the State argued in closing that it had been completely forthcoming about Gaines' criminal history: "When Alfred Gaines . . . took the stand, did we hide anything about him from you? Was he—did you learn all about his criminal past?"[112] The State also argued that Gaines motive for testifying arose from his "decision to try and give some peace to a couple of families of murder victims and

---

[110] The Superior Court found that "Trial Counsel . . . was aware of the discharge of the violation of probation . . . ." *Starling*, 2014 WL 4386127, at *5. No evidence supports this finding. On the contrary, Trial Counsel testified that he did not know that the State had asked to Superior Court to withdraw Gaines' VOP and capias. App. to Opening Br. at 1729; *id.* at 922 ("I knew that Mr. Gaines was on probation and that he was being permitted to reside out of state pending trial in Mr. Starling's case."). Neither the State nor Trial Counsel asked Gaines about any active capiases or VOPs at trial.

[111] *See* App. to Opening Br. at 1333; *id.* at 1725; *id.* at 468-69 (Trial Counsel's Handwritten Notes Showing VOP Pending).

[112] *Id.* at 645 (Trial Tr., Oct. 22, 2003).

33

come forward with what he said. You saw Alfred Gaines testify. It is your judgment on credibility that most matters."[113]

The Superior Court also ruled that it was unlikely that Trial Counsel would have used the information to impeach Gaines, and therefore Starling did not suffer prejudice from the *Brady* violation. Specifically, the court found that Trial Counsel "properly avoided making this presentation to the jury which would have implicated Starling in another shooting."[114] The court was referring to the shooting in Chester, where Starling allegedly shot Gaines while Gaines was on probation. Starling allegedly shot Gaines in retaliation for Gaines' shooting of Starling's acquaintance in Wilmington the day before.[115] According to the court, Trial Counsel and the State had an agreement not to mention the Chester shooting at trial. The court inferred from this agreement that raising the Chester shooting at trial would have abrogated the agreement and opened the door to the State questioning Gaines about the circumstances of the shooting, including testimony from Gaines that Starling shot him. We are unconvinced that any of these reasons would have prevented Trial Counsel from using the *Brady* material to impeach Gaines at trial.

---

[113] *Id.*
[114] *Starling*, 2014 WL 4386127, at *5.
[115] App. to Opening Br. at 445, 450 (Trial Tr., Oct. 10, 2003).

As an initial matter, the State and Trial Counsel did not have an agreement not to mention the Chester shooting at trial. A Chester police detective testified at trial that Gaines was shot in Chester.[116] Gaines also testified that after being shot in Chester he decided to tell the police about the Wilmington shooting.[117] Instead, counsel agreed that Gaines could not testify that Starling shot him in Chester.[118] The agreement would not have prevented Trial Counsel from impeaching Gaines with the dismissal of the capias and the VOP charges.

Further, questioning Gaines about the VOP charge would not necessarily have opened the door for the prosecution to question Gaines about the Chester shooting. Both the State and Starling were at risk if either party opened the door to the Chester shooting details. If the State asked to pursue the details of the Chester shooting, Gaines, the State's main witness whose credibility was at stake, would also be questioned about the Wilmington shooting, where he allegedly shot Starling's acquaintance the day before. This standoff in all likelihood led to the agreement between counsel. In any event, Trial Counsel was never in the position to make a strategic call on the use of the evidence, because he was unaware of it.

---

[116] App. to Opening Br. at 524-26 (Trial Test. of Officer Hampel, Oct. 16, 2003).
[117] *Id.* at 537 (Trial Test. of A. Gaines, Oct. 16, 2003).
[118] *Id.* at 528 (Trial Tr., Oct. 16, 2003).

We note that Trial Counsel testified that had he been aware of the *Brady* information, he would have used the information to impeach Gaines at trial.[119]

The judge at Starling's trial was keenly focused on issues that would arise if either the prosecution or the defense opened the door to the details of the Chester and Wilmington shootings. The main trial could have turned into a "mini-trial" of the Chester and Wilmington shootings.[120] To prevent this, the trial judge had options for allowing the impeachment to be used by Trial Counsel, while permitting the State a fair opportunity to respond, without abrogating the agreement between counsel. For example, the trial judge could have permitted Trial Counsel to impeach Gaines using the dismissal of the capias and VOP charge. Consistent with counsel's agreement, the State would be able to respond with what it contended was the reason the capias and VOP charges were dismissed—not for any *quid pro quo* with Gaines but instead "because Gaines was not able to comply because he'd been shot."[121] All of this examination could be done without referring to the shooter in either alleged shooting.

---

[119] *Id.* at 1729.
[120] *Id*. at 440-50 (Trial Tr., Oct. 10, 2003).
[121] *Id*. at 1229.

**E. The Cumulative Effect Of Ineffective Assistance Of Counsel And The *Brady* Violation Undermines Our Confidence In The Verdict**

Counsel's ineffective performance under *Strickland* for failing to object to Michael's statement and for failing to effectively examine Moore, combined with the State's *Brady* violation, undermines our confidence in the verdict. The touchstone of either test, *Strickland* or *Brady*, is the fairness of the trial.[122] Where there are multiple material errors in a trial, the Court must weigh their cumulative effect and determine if, combined, they are "prejudicial to substantial rights [so] as to jeopardize the fairness and integrity of the trial process."[123] The relevant inquiry is, after considering the errors, "whether we can be confident that the jury's verdict would have been the same."[124] We find that the procedural errors in this case resulted in an unfair trial.

Gaines was the State's main witness, and his credibility was already at risk due to his criminal record and the Wilmington shooting. Trial Counsel could have used the dismissal of the capias and VOP charges to counter Gaines' testimony that it was a concern for the victims' families that brought him to testify. As noted in

---

[122] *See Breakiron v. Horn*, 642 F.3d 126 (3d Cir. 2011) (cumulative effect of *Brady* violation and ineffective assistance of counsel deprived defendant of a fair trial).

[123] *Hoskins v. State*, 102 A.3d 724, 735 (Del. 2014) (quoting *Turner v. State,* 5 A.3d 612, 615 (Del. 2010)); *see also Wright*, 91 A.3d at 993-94 (holding that cumulative effect of multiple *Brady* violations undermined confidence in the fairness of the proceedings such that a new trial was warranted).

[124] *Kyles v. Whitley*, 514 U.S. 419, 453 (1995).

*Michael v. State*, impeachment evidence of this kind can make the difference between conviction and acquittal. Counsel's ineffectiveness also deprived Starling of two major avenues of attack on the credibility of the State's corroborating witnesses. Substantial issues existed about the voluntariness of Michael's statement to police, and Trial Counsel would have risked nothing by objecting to the statement and demanding a voluntariness hearing. Trial Counsel also forgot to ask the eyewitness with perhaps the best view of the shooter about his review of Starling's photograph and statement that Starling did not look like the shooter. The cumulative effect of these mistakes, unintentional as they may be, requires reversal, and a remand for a new trial. Because we have found reversible error on the foregoing grounds, we do not reach Starling's other claims.

## IV. CONCLUSION

Darnell Evans and Damon Gist, Jr. were the victims of a heinous and violent crime. Starling stands accused of the murders and must face trial. Like all citizens, he is entitled to a fair trial that adheres to procedural requirements with effective representation. Because those procedural requirements were not met, and counsel defending him was ineffective, we are compelled to reverse and remand for a new trial and proceedings not inconsistent with this opinion.

The judgment of the Superior Court is reversed and this matter is remanded for a new trial.

**VAUGHN**, Justice, concurring:

I agree that a *Brady* violation occurred, and I am satisfied that it warrants a new trial. I write separately because I do not agree with the Court's conclusions on the Moore cross-examination or the Michael Starling statement.

On direct examination at trial, Moore stated that he, himself, was 5'11", and that the shooter was "about my height."[125] When asked whether he was sure that the shooter was neither taller nor shorter than him, he responded:

> I mean, it happened so quick, so it was like, you know, I just gave my guesstimate. He was either shorter or taller, but I know he wasn't taller than me. I know that for a fact.[126]

On cross-examination, Moore estimated the shooter's height at 5'11" or a little shorter. He testified that his own weight was 175, and that the shooter had a little smaller build than his.

Trial counsel then confronted Moore with the fact that he had told an investigator that the shooter's height was 6'1" or 6'2". Moore admitted telling the investigator that the shooter was 6'1" or 6'2", but explained it this way:

> Now that I'm looking at it, I remember saying it. Like I said, it happened so quick, I mean, just basically threw it out there.[127]

---

[125] Appellant's Op. Br. App. at A496.
[126] *Id*.
[127] *Id*. at A498.

40

Thus, trial counsel elicited on cross-examination that Moore had given the investigator an estimate of the shooter's height which was substantially at variance with Starling's actual height. Moore also admitted that he had reported to the investigator that the shooter weighed about 200 or 205 pounds. In his closing argument, trial counsel argued these conflicts to the jury, and argued that 6'1" or 6'2" and 200 or 205 pounds better described Gaines than Starling.

On this record, Starling has failed to establish prejudice from trial counsel's failure to ask about the photos of the suspects. A question about the photos would have informed the jury that Moore had said that neither photo looked like the shooter, and that the shooter was taller than Starling. But counsel did put before the jury the fact that Moore had said to an investigator that the shooter was 6'1" or 6'2" and 200 to 205 pounds. It made no difference. Nothing in the record suggests that repeating it a second time in the context of the photos would have made any difference. And there is nothing in the record to indicate how Moore would have handled the question if he had been asked. When asked about his statement that the shooter was 6'1" or 6'2", he tried to minimize it, saying that he had "just basically, threw it out there."[128]  Since Starling has failed to establish prejudice, I need not consider whether trial counsel's failure to ask about the

---

[128] *Id.*

photos fell below an objective standard of reasonableness. I do think it merits mention, though, that here we have an instance of human error, the forgetting to ask a question. In my opinion, when trial counsel's cross-examination of Moore is considered as a whole, the Court's finding that his failure to ask about the photos fell below an objective standard of reasonableness sets an unfortunate precedent.

Starling has also failed to establish prejudice with regard to Michael Starling's statement. Prejudice exists only if the statement is involuntary and thus inadmissible. The place to make that showing is in this post-conviction proceeding, where the *Strickland* analysis is taking place. In the Superior Court, Starling's claim of ineffectiveness regarding Michael Starling's statement included an assertion that the statement was involuntary. In its post-conviction opinion, the Superior Court rejected Starling's claim. The fact that he can make the same assertion when he goes back to his new trial, with an unknown outcome, does not establish prejudice under *Strickland*.

I express no opinion on the voluntariness or lack of voluntariness of Michael Starling's statement, as the issue may come back to us on a developed Superior Court record if Starling is convicted at his new trial. I hope the Superior Court judge hearing Starling's case will not be influenced, even slightly, by this Court's statement that "serious doubt existed about the voluntariness of Michael's

42

statement."  I hope that the Superior Court judge will render her own, independent judgment based upon her evaluation of the evidence.